C. H. BROWN ET AL. (RAILROAD COMMISSION OF TEXAS ET AL.)
v. HUMBLE OIL & REFINING COMPANY.

No. 6729. Decided June 12, 1935.
Rehearing overruled November 27, 1935.
(83 S. W., 2d Series, 935; 87 S. W., 2d Series, 1069.)

*Hamilton, Hamilton & Turner,* of Dallas, *J. W. Wheeler,* of Austin, *James V. Allred,* former Attorney General, *Willis E. Gresham,* former Assistant Attorney General, *Wm. McCraw,* Attorney General, *Maurice Cheek, Archie D. Gray,* Assistants Attorney General, for plaintiffs in error.

On proposition that question was moot. Mullins v. Bosl, 22 S. W. (2d) 727; Gilbert v. Weber, 19 S. W. (2d) 857; Fuller v. Edy, 45 S. W. (2d) 448.

There was no evidence to show that the drilling of the well or producing oil therefrom would create waste. Houston & T. C. Ry. Co. v. East, 98 Texas, 146; Clinchfield Coal Corp v. Compton, 139 U. S., 308.

*E. E. Townes, Rex G. Baker, Hines H. Baker, R. E. Seagler,* all of Houston, *T. L. Foster* and *J. W. Timmins,* both of Dallas, *Powell, Wirtz, Rauhut & Gideon,* of Austin, for defendants in error.

Under its police powers the State of Texas can regulate the spacing of oil wells on the land involved. The Railroad Commission has power to make and enforce rules regulating the spacing and drilling of oil wells, and such rules have the effect of an act of the Legislature. State v. Jarmon, 25 S. W. (2d) 936; Magnolia Pet. Co. v. Stroud, 3 S. W. (2d) 462; McEachern v. Town of Highland Park, 124 Texas, 36, 73 S. W. (2d) 487.

*Thomas B. Greenwood, Dan Moody, J. B. Robertson,* all of Austin, *Elwood Fouts, R. J. Bogle,* and *W. G. Banks,* all of

Houston, *Robt. E. Hardwicke*, of Fort Worth, *Saner, Saner & Jack*, of Dallas, *Myron G. Blalock, Jack Blalock, Clarence Lohman*, and *Richard W. Blalock*, all of Marshall and Houston, *John E. Kilgore*, of Wichita Falls, and *Robt. B. Keenan*, of Tyler, all filed briefs as amici curiae.

MR. JUSTICE SHARP delivered the opinion of the court.

The Humble Oil & Refining Company filed this suit to set aside an order of the Railroad Commission granting a permit to Mrs. Gladys McCook, guardian of the estate of Dora May Johnson, a minor, to drill an oil well on 1½ acres of land owned by the minor in Gregg County, and against C. H. Brown, lessee thereof, and O. C. Fisher, his drilling contractor, to restrain them from drilling or producing oil therefrom; and to restrain the Railroad Commission from granting any further drilling permit thereon. The District Court refused such relief, and the case was appealed to the Court of Civil Appeals at Austin, and the judgment of the trial court was reversed and the injunctive relief prayed for granted by a divided court. 68 S. W. (2d) 622.

We quote from the opinion of the Court of Civil Appeals the following controlling facts:

"The Humble acquired a lease on a 47/48 interest in 102-acre tract out of the G. W. Hooper survey in Upshur and Gregg counties in 1931. Dora May Johnson owned the other 1/48 interest subject to the life estate of her mother. On October 20, 1932, by a partition decree of the District Court of Gregg County, there was set aside to said minor a 3-acre tract, 130 varas square, adjoining the south line of said 102-acre tract, near its southeast corner. On December 17, 1932, Mrs. McCook, as guardian, with approval of the probate court, and pursuant to previously executed contract with her attorneys, conveyed to her attorneys, Hamilton & Hamilton, as compensation for their services, the minor's east half of said 3-acre tract. Hamilton & Hamilton in turn conveyed same on December 19, 1932, to C. H. Brown who contracted on December 22, 1932, with O. C. Fisher to drill a well thereon. This well, after protests, suit, and other proceedings not necessary to set forth here, has been drilled on said east 1½ acres. Thereafter, on April 10, 1933, Mrs. McCook, individually and as guardian, applied to the Railroad Commission for a permit to drill another well on the west 1½ acres of said 3-acre tract, which permit was granted on April 21, 1933, under an exception to rule 37 to protect vested rights. On April 28, 1933,

Mrs. McCook, as guardian, under authorization of the probate court, leased said west 1½ acres to C. H. Brown, the same man to whom Hamilton & Hamilton had conveyed the east 1½ acres of said tract, who entered into a drilling contract with O. C. Fisher on May 4, 1933, to drill a well thereon. This suit was thereupon filed by the Humble which owned the lease on the lands to the west, north and east of the 3-acre tract partitioned to Dora May Johnson."

■ The first question presented for decision, as was presented in the Court of Civil Appeals, is that the question involved here is moot. This contention is based upon an affidavit, which shows that the well in question was completed and had been producing oil under such permit since June 28, 1933. The permit was granted on April 21, 1933, and a drilling contract was made on May 4, 1933, to drill the well. A suit was filed in the District Court to set aside the permit on May 12, 1933, and, upon the execution of a bond, a temporary restraining order was entered on that date. This order was continued to May 31, 1933, and upon a hearing thereof, the order was on June 1, 1933, dissolved. An appeal was taken to the Court of Civil Appeals, and on June 2, 1933, the appeal bond was filed. The Court of Civil Appeals correctly held that the case was not moot. This holding is sound, because the order of the Railroad Commission upon this question is subject to review by the courts. See Arts. 4662, 6453, 6049c, Vernon's Annotated Civil Statutes. Certainly under the state of this record the rights of the parties are not settled until the litigation has terminated. We overrule this contention.

■ The main question for decision here involves the construction of Rule 37 of the Railroad Commission. This rule relates to the development and production of oil and gas. The discovery of oil and gas has brought for solution many complex problems. The Legislature has been frequently called upon to pass laws fixing the rights of all parties interested therein. In 1917 Section 59a, Article 16, of the Constitution of Texas was adopted, and that provision requires the Legislature to "pass all such laws as may be appropriate to the conservation and development of all the natural resources of this State." Oil and gas should be, and generally are, treated as being natural resources.

In 1899 the Legislature, clearly recognizing the public interest in oil and gas, enacted Arts. 6004-6007, Revised Civil Statutes 1925. These Articles describe how a well shall be

drilled and the precautions to be taken when drawing the casing from a well which had penetrated oil or gas bearing rocks, "in such manner as shall prevent the oil and gas from escaping therefrom." Arts. 6008-6013, Vernon's Annotated Texas Civil Statutes, now provide heavy penalties for failure to prevent the escape of oil and gas, and plainly recognize the rights of any citizen to take steps to compel the compliance with the law in order to restrain the waste of oil and gas.

The oil industry in this State has become stupendous. There are now many separate oil fields operated in this State, under varying conditions. Texas is now the leading State in the production of oil and in oil refineries. The handling of this giant industry and its complex problems calls for the services of trained and experienced persons. It is utterly impossible for the Legislature to meet the demands of every detail in the passage of laws relating to the production of oil and gas. The necessities of the situation require that this duty be placed upon some tribunal to carry out some just and reasonable public policy. This duty is placed on the Railroad Commission.

The basis for the power of the Railroad Commission to act is found in the Acts of the Legislature, Title 102, Arts. 6004, etc., Vernon's Annotated Texas Civil Statutes. The Legislature has defined in plain and specific language the public policy of this State with respect to the conservation and waste of oil and gas. Art. 6014, which was in force at the time the permit in this case was granted, in part reads:

"The production, storage or transportation of crude petroleum oil or of natural gas in such manner, in such amount, or under such conditions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among other things shall specifically include:

"(a) The operation of any oil well or wells with an inefficient gas-oil ratio, and the Commission is hereby given authority to fix and determine by order such ratio.

"(b) The drowning with water of any stratum or part thereof capable of producing oil or gas, or both oil and gas, in paying quantities.

"(c) Underground waste or loss however caused and whether or not defined in other subdivisions hereof.

"(d) Permitting any natural gas well to burn wastefully.

"(e) The wasteful utilization of natural gas, provided, however, the utilization of gas, lawfully permitted to be produced from a well producing both oil and gas, for manufacturing gasoline shall not be construed to be wasteful, and

provided further that the utilization of natural gas authorized by the Commission under the provisions of Section 2 of Acts of the Forty-second Legislature, First Called Session, Chapter 26 (Art. 6008), shall·not be construed as wasteful.

"(f)   The creation of unnecessary fire hazards.

"(g)   Physical waste or loss incident to, or resulting from, so drilling, equipping, locating, spacing or operating well or wells as to reduce or tend to reduce the total ultimate recovery of crude petroleum oil or natural gas from any pool.

"(h)   Waste or loss incident to, or resulting from, the unnecessary, inefficient, excessive or improper use of the reservoir energy, including the gas energy or water drive, in any well or pool; however, it is not the intent of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be utilized under one management, control or ownership.

"(i)   Surface waste or surface loss, including unnecessary or excessive surface losses or destruction of crude petroleum oil or natural gas without beneficial use.

"(j)   The escape into the open air, from a well producing both oil and gas, of natural gas in excess of the amount which is necessary in the efficient drilling or operation of the well.

"(k)   The production of crude petroleum oil in excess of transportation or market facilities or reasonable market demand. The Commission is authorized to determine when such excess production exists or is imminent, and to ascertain the reasonable market demand.

"The Commission is expressly authorized to consider any or all of the above definitions in making rules, regulations or orders to prevent waste of oil or gas. (As amended Acts 1929, 41st Leg., p. 694, ch. 313; Acts 1931, 42nd Leg., 1st C. S., p. 46, ch. 26; Acts 1932, 42nd Leg., 4th C. S., p. 3, ch. 2 §1.)"

The foregoing Article was amended by the Acts of 1935, 44th Legislature, H. B. No. 782, §2, which became effective April 13, 1935, by adding thereto the following provision:

"Nothing in this Section shall be construed to authorize limitation of production of marginal wells, as such marginal wells are defined by Statute, below the amount fixed by Statute for such wells."

We pause to say that the validity of Section (k) of the foregoing Article is not questioned here. The Act is so drawn that, if any section is declared invalid, it would not destroy the entire Article, because it is severable from the other sections.

We, therefore, express no opinion as to the validity or invalidity of Section (k).

The mandate was placed on the Railroad Commission to "make and enforce rules, regulations or orders for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, including rules, regulations or orders for the following purposes:

"(1) To prevent the waste, as hereinbefore defined, of crude petroleum oil and natural gas in drilling and producing operations and in the storage, piping and distribution thereof.

"(2) To require dry or abandoned wells to be plugged in such way as to confine crude petroleum oil, natural gas, and water in the strata in which they are found and to prevent them from escaping into other strata.

"(3) For the drilling of wells and preserving a record thereof.

"(4) To require wells to be drilled and operated in such maner as to prevent injury to adjoining property.

"(5) To prevent crude petroleum oil and natural gas and water from escaping from the strata in which they are found into other strata.

"(6) To establish rules and regulations for shooting wells and for separating crude petroleum oil from natural gas.

"(7) To require records to be kept and reports made by oil and gas drillers, operators, and carriers of crude petroleum oil or natural gas and by its inspectors.

"(8) It shall do all things necessary for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, and shall make and enforce such rules, regulations or orders as may be necessary to that end. (As amended Acts 1931, 42nd Leg., 1st C. S., p. 46, ch. 26; Acts 1932, 42nd Leg., 4th C. S., p. 3, ch. 2, §7.)"

The foregoing Art. 6029 was amended by the Acts of 1935, 44th Legislature, H. B. No. 782, §4, by adding thereto the following provision:

"(9) To provide for the issuance of permits, tenders, and other evidences of permission when the issuance of such permits, tenders, or permission is necessary or incident to the enforcement of its rules, regulations, or orders for the prevention of waste."

The Commission is empowered to give notice and conduct hearings upon its own initiative, without complaint or on complaint of any party interested, after notice and hearing as provided by Art. 6038, Revised Civil Statutes 1925, to determine

if waste is imminent or being committed; and if such determination is made, to promulgate such rule, regulation, or order as in its judgment is reasonably necessary to correct same. See Art. 6049a. Heavy penalties are placed upon all parties violating the provisions of the law or any valid rule or regulation promulgated by the Commission thereunder. It provides that any interested party affected by the conservation laws relating to crude petroleum or natural gas, or the waste thereof, or by any rule or order of the Commission, is authorized to file suit in the District Court of Travis County against the Commission to test the validity of such laws, rules, regulations, or orders. (Acts of 42nd Legislature, 4th Called Session, p. 3, ch. 2, §5; Acts 1932, 42nd Legislature, 4th Called Session, p. 3, ch. 2, §8; Art. 6049-c, Second Supplement, Complete Texas Statutes, 1934, pp. 226, 227.)

As stated above, the permit to drill the well in question was granted on April 21, 1933. Rule No. 37 was in force at the time of the granting of the permit. As amended January 31, 1933, this rule reads as follows:

"Rule 37, adopted November 26, 1919, is hereby amended in so far as it applies to the East Texas Field so as to hereafter read as follows: 'No well shall hereafter be drilled for oil or gas at any point less than six hundred and sixty (660) feet from any drilling or completed well; and no well shall hereafter be drilled for oil. or gas at any point less than three hundred and thirty (330) feet from any property or division line; provided, however, the Commission in order to prevent waste or to protect vested rights, will, after hearing, grant exceptions permitting drilling within a less or shorter distance than hereinabove prescribed, upon application duly filed fully stating the facts, notice of such application and hearing having been first given to all adjacent lessees affected thereby; provided, that if all adjacent lessees affected thereby waive in writing, notice of hearing on or objection to the granting of said application, the Commission may proceed to determine such application without hearing; and, provided further that in cases of forced offsets the Commission may grant exceptions without waivers or hearing when it is evident that the wells desired are necessary to protect the properties on which it is proposed to drill them.' "

Rule 37 was amended June 13, 1933, by adding to the exceptions described therein the following: "or to protect any property against undue drainage by reason of the operation of the wells of any other operator." However, for the purposes

of this opinion we will consider the rule in force at the time of granting the permit in question.

■ The common law recognizes no well spacing regulations. At common law the land owner can drill an unlimited number of wells for oil and gas upon his land. Mills & Willingham, Oil & Gas (1926), §270; Summers, Oil & Gas (1927), 73-76. The adjoining land owner cannot complain if wells are drilled near his boundary line. Under this rule the only way the land owner can protect himself is to drill offset wells. Prairie Oil & Gas Co. v. State, 231 S. W., 1088 (Tex. Comm. App., 1921); Hunt v. State, 48 S. W. (2d), 466 (Texas Civ. App., 1932); Kelley v. Ohio Oil Co., 57 Ohio St., 317, 49 N. E., 399, 39 L. R. A., 765, 63 Am. St. Rep., 721 (1897); Barnard v. Monongahela Natural Gas Co., 216 Pa., 362, 65 Atl., 801 (1907). However, this rule has been modified in this State. Title 102, Vernon's Annotated Texas Civil Statutes, and particularly Arts. 6014, 6029, 6046.

The rule in Texas recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. Lemar v. Garner, 121 Texas, 502, 50 S. W. (2d), 769; Humphreys-Mexia Co. v. Gammon, 113 Texas, 247, 254 S. W., 296, 29 A. L. R., 607; Waggoner Estate v. Sigler Oil Co., 118 Texas, 509, 19 S. W. (2d), 27; Texas Co. v. Daugherty, 107 Texas, 226, 176 S. W., 717, L. R. A., 1917F, 989.

■ Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right. And it is limited only by the physical possibility of the adjoining land owner diminishing the oil and gas under one's land by the exercise of the same right of capture. The following decisions discuss the law of capture as applied in this State: Stephens Co. v. Mid-Kansas Oil & Gas Co., 113 Texas, 160, 254 S. W., 290; Houston & T. C. Ry. Co. v. East, 98 Texas, 146, 81 S. W., 279, 66 L. R. A., 738, 107 Am. St. Rep., 620; Prairie Oil & Gas Co. v. State (Comm. Appls.) 231 S. W., 1088. Both rules are subject to regulation under the police power of a state.

It is impossible to measure the exact quantity of oil and gas beneath each tract of land. It is equally impossible to fix a standard which will give exact justice to all land owners. Some land owners wish to produce oil and gas to the limit,

while others desire to keep their oil and gas in the ground and develop it in less quantities. Hence arises the conflict of interests. It is now, however, recognized that when an oil field has been fairly tested and developed, experts can determine approximately the amounts of oil and gas in place in a common pool, and can also equitably determine the amount of oil and gas recoverable by the owner of each tract of land under certain operating conditions.

■ The Legislature in the exercise of its power has passed regulatory measures to prohibit the waste of oil and gas in this State. Title 102, Vernon's Annotated Texas Statutes, and Supplements thereto. The power of the Railroad Commission to act on this matter is limited to the authority granted by the Legislature. The fundamental standards prescribed in the statutes will control. Certain Acts were passed which specifically declare the public policy of this State with respect to the development and protection of oil and gas, and established primary standards relating to such policy, and placed the duty upon the Railroad Commission to carry out the details under the general provisions of the statutes. That this is a valid exercise of power is now definitely settled. Trimmer v. Carlton, 116 Texas, 572, 296 S. W., 1070; City of Denison v. Municipal Gas Co., 117 Texas, 291, 3 S. W. (2d), 794; Shupee v. R. R. Commission, 123 Texas, 521, 73 S. W. (2d), 505; Texas & P. Motor T. Co. v. R. R. Commission, 124 Texas, 126, 73 S. W. (2d), 509; Spears v. San Antonio, 110 Texas, 618, 622, 223 S. W., 166; West Texas Comp. Co. v. Ry. Co., 15 S. W. (2d), 560; City of San Antonio v. Jones, 28 Texas, 19, 33; 6 Ruling Case Law, §178, pp. 177, 178.

■ In the absence of a well defined standard or rule in the statutes defining the public policy of the State with respect to the mineral interests, the Railroad Commission would be without outhority to promulgate rules, regulations, or orders relating to the protection of oil and gas. The power to pass laws rests with the Legislature, and that power cannot be delegated to some commission or other tribunal. Article 2 and Section 1 of Article 3 of the Constitution; Langever v. Miller, 124 Texas, 80, 76 S. W. (2d), 1025, 96 A. L. R., 836, and authorities cited; Panama Ref. Co. v. Ryan, 293 U. S., 388, 55 Sup. Ct., 241, 79 L. Ed., 223; Schechter Poultry Corp. v. U. S., 79 L. Ed., 678, 55 Sup. Ct. Rep., 837.

In order to carry out the commands of the Legislature, the Railroad Commission adopted Rule 37. The validity of this rule

has been upheld repeatedly. Oxford Oil Co. v. Atlantic Oil & Producing Co., 16 Fed. (2d), 639 (N. D. Texas, 1926), affirmed 22 Fed. (2d), 597 (C. C. A., 5th, 1927), cert. denied, 277 U. S., 585, 48 Sup. Ct., 433, 72 L. Ed., 1000 (1928); Comment (1927), 5 Texas Law Review, 328; Humble Oil & Refining Co. v. Strauss, 243 S. W., 528, 536, (Tex. Civ. App., 1922); Railroad Commission v. Bass, 10 S. W. (2d), 586 (Tex. Civ. App., 1928); State v. Jarmon, 25 S. W. (2d), 936, 938, (Tex. Civ. App., 1930), writ of error dismissed; Rabbit Creek Oil Co. v. Shell Pet. Corp., 66 S. W. (2d), 737, (Tex. Civ. App., 1933). Texas Law Review, Vol. XIII, No. 1, p. 119, contains an able and interesting review of this rule.

■ Rule 37 was first adopted in 1919. It has been amended from time to time, to meet the purposes for which it was adopted. Does the Railroad Commission possess the power to carry out the purposes for which Rule 37 was adopted? Section 59a, Article 16 of the Constitution directs the Legislature to do whatever is necessary for the conservation of natural resources. The Legislature has undertaken to comply with this provision of the Constitution. Therefore, the Railroad Commission, acting under valid laws, has ample authority, under both the Constitution and the police power, to prevent waste and conserve the mineral interests of this State. This rule is supported by a host of authorities. For a full and exhaustive discussion of this question we cite the following: Lombardo v. City of Dallas, 124 Texas, 1, 73 S. W. (2d), 475, 478; Marblehead Land Co. v. City of Los Angeles, 47 Fed. (2d), 528, 531; (the United States Supreme Court denied a certiorari in that case, 284 U. S., 634, 52 Sup. Ct., 18, 76 L. Ed., 540); Houston & T. C. Ry. Co. v. City of Dallas, 98 Texas, 396, 413, 415, 84 S. W., 648, 70 L. R. A., 850; Marrs v. City of Oxford, 24 Fed. (2d), 541, 552, 32 Fed. (2d), 134, 67 A. L. R., 1336 (C. C. A., 8th, 1929), Cert. denied, 280 U. S., 573, 50 Sup. Ct., 29, 74 L. Ed., 625; Ohio Oil Co. v. Indiana (No. 1), 177 U. S., 199, 201, 20 Sup. Ct., 576, 44 L. Ed., 729; Linsley v. Natural Carbonic Gas Co., 220 U. S., 61, 31 Sup. Ct., 337, 55 L. Ed., 369, Ann. Cas., 1912C, 160; Champlin Rfg. Co. v. Commission, 286 U. S., 210, 233, 234, 52 Sup. St., 559, 76 L. Ed., 1062, 86 A. L. R., 403; Oxford Oil Co. v. Atlantic Oil Producing Co., 16 Fed. (2d), 639, 642, 22 Fed. (2d), 597; (the United States Supreme Court denied a certiorari in that case, 277 U. S., 585, 48 Sup. Ct., 433, 72 L. Ed., 1000); F. C. Henderson, Inc., v. Railroad Commission of Texas, 56 Fed. (2d), 218, 221; Sterling v. Con-

stantin, 287 U. S., 378, 396, 53 Sup. Ct., 190, 77 L. Ed., 375, 384, 385; N. Y. C. R. Co. v. White, 243 U. S., 187, 197, 198, 61 L. Ed., 667, 672, 673; 67 A. L. R., p. 1348, L. R. A., 1917D, 1, Ann. Cas., 1917 D, 629.

In the case of Lombardo v. City of Dallas, 124 Texas, 1, 73 S. W. (2d), 475, 478, Chief Justice Cureton in a very able and exhaustive opinion reviews many authorities touching this question, and in the opinion rendered for the Court said:

"The insistence that the right of property or the *unrestricted use* of property is not subject to the police power has long since been determined adversely to that contention.

"Texas Jurisprudence states the general rule as applied in this State as follows:

*     *     *     *     *     *

" 'All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights or person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law.' "

He further said:

"The foregoing (rules) suffice to show that the police power may be exerted to regulate the use, and where appropriate or necessary prohibit the use, of property for certain purposes in aid of the public health, morals, safety, and general welfare, and that the constitutional limitations form no impediment to its exertion where the enactment is reasonable and bears a fair relationship to the object sought to be attained."

The noted case of Ohio Oil Company v. Indiana (No. 1), 177 U. S., 190, 202, 20 Sup. Ct., 576, 44 L. Ed., 729, involved the owner's right to the unrestricted production of oil and gas from his own and his neighbors' lands under the law of Indiana. The reasoning of Mr. Justice White, who afterwards became Chief Justice of the Supreme Court of the United States, is so clear and convincing, and equally applicable to the laws of this State, that we quote liberally from the opinion. In the course of the opinion he stated:

"No time need be spent in restating the general common law rule that the ownership in fee of the surface of the earth carries with it the right of the minerals beneath, and the consequent privilege of mining to extract them. And we need not, therefore, pause to consider the scope of the legislative author-

ity to regulate the exercise of mining rights and to direct the methods of their enjoyment so as to prevent the infringement by one miner of the rights of others. Del Monte Mining Co. v. Last Chance Mining Co., 171 U. S., 55, 60."

He then exhaustively discusses the analogies between animals *ferae naturae* and mineral deposits of oil and gas, and clearly shows the lack of identity. He defines the nature of property in oil and gas while stored in the ground, and the rights of the respective owners of the surface to the oil and gas in the common reservoir. In reaching the conclusions stated, the following language is used:

"In things *ferae naturae* all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No divesting of private property, under such a condition, can be conceived because the public are the owners, and the enacting by the State of a law as to the public ownership is but the discharge of the governmental trust resting in the State as to property of that character. Geer v. Connecticut, supra, 161 U. S., 519, 16 Sup. Ct., 600, 40 L. Ed., 793.) On the other hand, as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a co-equal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of

their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by things *ferae naturae,* which it is unquestioned the legislature has the authority to forbid all from taking, in order to protect them from undue destruction, so that the right of the common owners, the public, to reduce to possession may be ultimately efficaciously enjoyed. Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the State of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument, upon which the attack on the statute must depend, involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them, in and to the substances contained in the common reservoir of supply, then as a necessary result of the right of property, its indivisible quality and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement, the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this, although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be *damnum absque injuria.* This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States."

He concludes the opinion in the following language:

"In view of the fact that regulations of natural deposits of oil and gas and the right of the owners to take them as an incident of title in fee to the surface of the earth, as said by the

Supreme Court of Indiana, is ultimately but a regulation of real property, and they must hence be treated as relating to the preservation and protection of rights of an essentially local character. Considering this fact and the peculiar situation of the substances, as well as the character of the rights of the surface owners, we cannot say that the statute amounts to a taking of private property, when it is but a regulation by the State of Indiana of a subject which especially comes within its lawful authority."

■ We shall now consider Rule 37 in connection with the foregoing rules and principles. We recognize the difficulty of giving a precise definition of what is to be done under the police power. As said by Judge Williams in the case of Houston & T. C. Ry. Co. v. City of Dallas, 98 Texas, 396, 415, 84 S. W., 648, 70 L. R. A., 850, in speaking of this power and its limitations:

"The power is not an arbitrary one, but has its limitations. It is commensurate with, but does not exceed the duty to provide for the real needs of the people in their health, safety, comfort and convenience, as consistently as may be with private property rights. As those needs are extensive, various and indefinite, the power to deal with them is likewise broad, indefinite and impracticable of precise definition or limitation. But, as the citizen can not be deprived of his property without due process of law, and as a privation by force of the police power fulfills this requirement only when the power is exercised for the purpose of accomplishing and in a manner appropriate to the accomplishment of the purpose for which it exists, it may often become necessary for courts, having proper regard to the constitutional safeguard referred to in favor of the citizen, to inquire as to the existence of the facts upon which a given exercise of the power rests, and into the manner of its exercise; and if there has been an invasion of property rights, under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary and oppressive way, to give to the injured party that protection which the Constitution secures. It is therefore not true, as urged by plaintiff, that the judgment of the legislative body concludes all inquiry as to the existence of facts essential to support the assertion of such a power as that now in question. If this were true, it would always be within legislative power to disregard the constitutional provisions giving protection to the individual. The authorities are practically in accord upon the subject."

We find no difficulty in ascertaining the clear meaning of the rule, except that part which grants exceptions permitting the drilling of wells near another "to prevent waste or to protect vested rights." When this part of the rule is construed in connection with the cardinal rules of property above stated, we think the language used is for the dominant purpose of protecting these property rights. The language used is sufficiently definite and certain to protect the fundamental rights of all concerned when construed in connection with the general rules of property. It guarantees the opportunity in each owner to recover his oil by providing an exception to a uniform spacing regulation that would otherwise prevent him from doing so. The exercise of the police power under this rule does not change the rule of property. It merely regulates and controls the way in which his property shall be used and enjoyed. Each person still owns the oil and gas in place under his land, and each still has the right to possession, use, enjoyment, and ownership of the oil and gas produced through wells located on his land, regardless of its origin. The primary rule of ownership is still operative. The rule of convenience becomes secondary.

Conditions may arise where it would be proper, right, and just to grant exceptions to the rule so as to permit wells to be drilled on smaller tracts than prescribed therein. Also, conditions may arise where it would be proper, right, and just to permit tracts to be subdivided and such subdivisions drilled after the adoption of the rule; but in all such instances it is the duty of the Commission to adjust the allowable, based upon the potential production, so as to give to the owner of such smaller tract only his just proportion of the oil and gas. By this method each person will be entitled to recover a quantity of oil and gas substantially equivalent in amount to the recoverable oil and gas under his land. Without trying to dictate to the Commission as to any particular form to be used, we would suggest, however, since it is possible to ascertain approximately the potential production of a proved oil field, and particularly the East Texas Oil Field, that Rule 37 be so amended as to specify the exceptions noted therein in more definite and appropriate terms, so that all persons interested in the field may know more definitely their rights thereunder. In this connection, we hold that since the Legislature has bestowed the power of administering the oil and gas business of this State on the Railroad Commission, every person has the right to apply to that tribunal for relief as a matter of right, and not as a matter of grace.

■ The Commission, in order to prevent waste, has the power to limit the rate of flow in the same way that it has the power to regulate spacing. See Champlin Refining Co. v. Corporation Commission, 286 U. S., 210, 233; 52 Sup. Ct., 559, 76 L. Ed., 1062, 86 A. L. R., 403; Danciger Oil & Refining Co. v. Railroad Commission, 49 S. W. (2d), 837. This right to control the rate of flow in order to prevent waste also enables the Commission to offset the advantage obtained by one who is given an exception to the spacing rule by limiting his allowable production to the extent necessary to overcome this advantage. In this way the Commission, by controlling the oil stored in the common reservoir, is enabled to carry out the dominant purpose of preventing waste, and, at the same time, permit each owner to enjoy the opportunity fully to realize upon his estate by developing and recovering his oil and gas. *We therefore hold that the Railroad Commission has the power, under the Conservation Statutes, to promulgate a spacing rule, as was done, regulating the drilling of oil wells, and to provide for an exception to the rule to protect vested rights and to prevent waste; and the exception to the rule is not too uncertain or indefinite so as to render the rule invalid. No unreasonable hardships need result, if the rule is faithfully and impartially applied by those authorized by law to administer it.*

It is undisputed that the permit granted herein violates the spacing regulations of Rule 37. If sustained as a valid permit, it must find support in the exceptions noted in the rule. At the time the 3 acre tract was set aside to this minor, Rule 37 before amendment was in force, and the spacing regulations the same as above set out. Under that rule not more than one well could be drilled on 20 acres, except by special permission of the Railroad Commission. The Commission granted a permit to drill one well on the 3 acres, and the well was in operation. Since the partition of the 3 acres after one well had been drilled thereon, a second permit was obtained to drill another on the 1½ acres. It is contended that no evidence was introduced at the hearing before the Railroad Commission showing that the drilling of a second well on the three acres was necessary to prevent waste, and no claim to that effect was made; and the Railroad Commission did not grant the permit for the second well on that theory, but on the recited ground of protecting vested rights. The Court of Civil Appeals in the majority opinion found that:

"Under the uncontroverted facts of this case, if the well on the 1½ acres involved be permitted to operate in such close

proximity to appellant's adjoining lands, injury to those lands will directly result, drainage occur, and waste result."

■ The decisions of the Railroad Commission on this question must be based upon proof, and must not be capricious or unreasonable. The mere holding of a hearing does not justify its action. If after a hearing the Commission acts without regard to the evidence, or makes a ruling wholly unsupported by the evidence, it cannot be said to have exercised its discretion. And where it is shown that the Commission has abused its discretion, or has acted illegally and issued a permit in violation of its rules, the courts are fully authorized to nullify the permit of the Commission and prevent its enforcement. Shupee v. Railroad Commission, 123 Texas, 521, 73 S. W. (2d) 505; 42 Corpus Juris, pp. 691, 692.

■ The merits of the rule may be materially impaired by exceptions improperty granted. The rule wisely provides that under certain conditions exceptions may be made. This prevents injustice to many owners of land and of oil and gas. No inflexible rule can be announced, but if an exception be necessary to meet the ends of justice, the application for such a permit is to be addressed to the Commission, whose orders are subject to review by the courts. Its acts must not be unreasonable, unjust, or arbitrary. *Where Rule 37 is in force in a certain territory, a voluntary subdivision of a tract of land subject to development for oil and gas as a whole would not entitle the owner of said divided tract, or tracts, as a matter of right, to an exception of Rule 37 on the ground of vested rights, because such act would destroy the rule and render the conservation laws a nullity.*

■ The application was made to the Railroad Commission for a permit to drill a well on the 1½ acres under the terms of Rule 37. The rights granted are by virtue of the exceptions contained in the rule. That being true, plaintiffs in error are not now in position to attack the validity of the provision of the rule under which they received and now hold their benefits. Baker v. Coman, 109 Texas, 85, 198 S. W., 141.

The judgment of the Court of Civil Appeals will be affirmed.

Opinion delivered June 12, 1935.

### ON REHEARING

This cause is now before us on a motion for rehearing filed by plaintiffs in error.

In the original opinion rendered in this cause, supra (83 S. W. (2d) 935), the following language was used:

"It is now, however, recognized that when an oil field has been fairly tested and developed, experts can determine approximately the amount of oil and gas in place in a common pool, and can also equitably determine the amount of oil and gas recoverable by the owner of each tract of land under certain operating conditions.

\*   \*   \*   \*   \*   \*

"Conditions may arise where it would be proper, right, and just to grant exceptions to the rule so as to permit wells to be drilled on smaller tracts than prescribed therein. Also, conditions may arise where it would be proper, right, and just to permit tracts to be subdivided and such subdivisions drilled after the adoption of the rule; but in all such instances it is the duty of the Commission to adjust the allowable, based upon the potential production, so as to give to the owner of such smaller tract only his just proportion of the oil and gas. By this method each person will be entiled to recover a quantity of oil and gas substantially equivalent in amount to the recoverable oil and gas under his land."

It appears that the first quotation above and a part of the second have been construed by some to mean that this Court has undertaken to prescribe them as rules and standards by which to determine property rights and as standards to control the Railroad Commission in promulgating conservation rules and orders relating to oil and gas. Others have construed the language, or part of the language, above quoted from the opinion to amount to a ruling that acreage must be used as the sole or controlling factor in determining how many oil and gas wells may be drilled on, or how much oil or gas may be taken from, a tract of land, or to hold in effect that whenever a well or wells are permitted to be drilled upon a small tract under the exception in Rule 37, the allowable from such wells must always be adjusted so that the tract will be permitted to produce only a quantity of oil measured by the proportion which its acreage bears to the acreage of tracts developed under the general provisions of the rule.

These are erroneous constructions of the opinion. The language quoted was used, not for the purpose of prescribing rules or standards, but merely in a discussion of the validity and purpose of the rule and its exception, as showing that the rule and the exception with respect to vested rights are reasonable; and

that, while it is "impossible to measure the quantity of oil and gas beneath each tract of land," or to "give exact justice to all land owners," the rule and the exception can be so administered as to prevent the invasion of property rights by fairly and reasonably, but of course not exactly, protecting each owner in the ownership of, and in the opportunity to save and produce, the oil and gas which according to the decisions in this State he has a right to take.

■ We recognize that the Railroad Commission is authorized to make rules relating to the production of oil and gas. This Court will not undertake to prescribe any rule or standard to guide the Commission, except that its actions must be legal, reasonable, and not arbitrary. There are many factors, facts, and circumstances, which we shall not undertake to detail here, in each case and in each hearing, which must be considered, weighed, and given effect, in the fair and reasonable administration of such laws, rules, and exceptions. All questions of fact are primarily for the Commission to determine.

■ We held in the original opinion, and reiterate it here, that the Legislature enacted certain laws which declare the public policy of the State with respect to the development and conservation of oil and gas, and placed the duty upon the Railroad Commission to carry out the details. The duty is lodged with the Railroad Commission to make rules to carry out the mandates of the Legislature, and to impartially enforce them. In the exercise of its power to grant exceptions to its rules, it is the duty of the Commission to treat all interested parties justly, fairly, and impartially under all the facts and circumstances of the case; and the actions and rulings of the Commission in attempting to accomplish such results will not be disturbed by the courts, unless they are clearly illegal, unreasonable, or arbitrary. All rules and rulings of the Railroad Commission are presumed to be valid until the contrary is made to appear. If a rule of the Commission is found to be illegal or invalid by a court of competent jurisdiction, such court may so adjudge. The court cannot substitute a new rule for the one adjudged invalid. That power rests exclusively with the Railroad Commission.

With the foregoing explanation, the motion for rehearing is overruled.

Opinion delivered November 27, 1935.