**HUMBLE OIL & REFINING CO. v. COOK et al.**

**No. 9734.**

Court of Civil Appeals of Texas. Austin.

Nov. 17, 1948.

Rehearing Denied Dec. 15, 1948.

Rex G. Baker, R. E. Seagler and Nelson Jones, all of Houston, and Powell, Wirtz & Rauhut, and J. A. Rauhut, all of Austin, for appellant.

Price Daniel, Atty. Gen., and Elton M. Hyder, Jr., Asst. Atty. Gen., (James D. Smullen, former Asst. Atty. Gen., of counsel), for Railroad Commission of Texas.

Weeks, Hankerson & Surles, of Tyler, for C. C. Cook.

HUGHES, Justice.

A Rule 37 case in which the Humble Oil & Refining Company is appellant and C. C. Cook and the Railroad Commission are appellees.

By stipulation of the parties, filed in the trial court, the issues to be tried were stated as follows: "If plaintiff (appellant) establishes that the C. C. Cook tract or lot identified in plaintiff's petition and on which the involved permit was granted was created by a voluntary subdivision which was illegal under the conservation laws and rules of the Railroad Commission (that is to say, a subdivision which is required to be disregarded in determining whether defendant (appellee) Cook was entitled to a permit to prevent confiscation of property), plaintiff shall be entitled to prevail in this suit unless defendant Cook prevails on his plea that plaintiff is estopped to raise the question of subdivision * * *."

Trial was without a jury. No findings of fact or conclusions of law were filed by the trial court.

These facts concerning the creation of the Cook lot are undisputed:

On June 18, 1931, the Kilgore Baptist Church owned Lots 6 and 7, Blk. 153, Kilgore Townsite, Van Winkle Survey in Gregg County, these combined contiguous lots being 100', on Main Street, by 115', on Martin Street.

On such date the Church conveyed to T. W. Lee 75' on Main Street by 65' on Martin Street.

On October 28, 1931, the Church conveyed to Evans and Edwards the remaining 50' frontage on Martin Street. This is now known as the Cook lot.

This left the Church with a tract 25' on Main Street by 65', which it sold to T. A. Hendricks on July 9, 1932.

No mineral leases were executed by the fee owners of Lots 6 and 7, the Church property, prior to the three sales above mentioned, and no mineral leases were executed by the fee owners of the three tracts into which the Church property was divided until the year 1937.

The East Texas Oil Field was brought in on September 5, 1930, the discovery well being about 15 miles southwest of Kilgore.

John V. Borders, a trustee of the Baptist Church when the Church properties were sold, testified that at such time he didn't know there was any oil "about there" and that "If we had we wouldn't have sold our property"; also that he had no "thought about the fact that it might be in an oil field some day."

This witness also testified that when the Church made its first sale the nearest well to Block 153 was the Knowles well which he thought to be "better than a half mile" away. Appellant's witness Kidd placed this well at about 850' from Blk. 153, and at about 1050' from the well (later drilled) on the Cook tract.

It was also shown that Borders, about four months before the Church made its first sale, executed an oil and gas lease on lots which he owned in Blk. 135, which is located diagonally across the street west of Blk. 153.

Records of the Railroad Commission show that as of the date the Church made its first sale four permits for drilling wells in the Kilgore townsite had been granted as exceptions under Rule 37; nine additional exception permits had been granted to drill in the Van Winkle Survey, the townsite covering a portion of this survey.

Other exception permits, as of the same date, shown as granted by such records are: Johnson No. 1 Borders in Blk. 153, the location being 450' from the Cook well; Doyle No. 1 Lawrence in Blk. 122, the second block west of Blk. 153; Rolph No. 1, in Blk. 150, the third block north-

east of Blk. 153; and Dearing & Sons No. 1 Boatright in Blk. 155, the second block southwest of Blk. 153.

When the Church sold the Cook tract to Evans and Edwards on October 28, 1931, the records of the Commission showed that fifty-four exception permits had been applied for, heard or granted in the Van Winkle Survey, and that at such time a permit had been applied for, heard or granted to drill on Blk. 167, which is diagonally across the street and south of Blk. 153.

The blocks mentioned above are city blocks all about 150' x 115'; all in the Van Winkle Survey and in the same general area.

The Railroad Commission's proration schedule of June 16, 1931, before the Church made its first sale, shows that there were 883 producing wells in the East Texas Field, 394 of which were in the "Kilgore District" and 12 of which were in the Van Winkle Survey, including National No. 1 Knowles, 1050' from the Cook location. A similar schedule of August 1, 1931, before the Church made its second sale, shows that there were 1460 producing wells in the East Texas Fields, 629 of which were in the "Kilgore District," and 40 of which were in the Van Winkle Survey. This list was supplemented by appellant's witness Kidd who testified to 23 wells which were commenced or completed in the Van Winkle Survey between August 1, 1931, and October 28, 1931.

When the Church made its second sale there was a producing oil well about 450' from the Cook location and four others within 1500' of Blk. 153.

The entire area of the Church lots was smaller than the spacing pattern required by rules of the Railroad Commission. The three lots into which this area was subdivided were necessarily too small to comply with such rules.

These facts, detailed above, show, as a matter of law, that the Cook tract was segregated at a time when the general area and territory in which it was located was part of a proven oil field and that such tract was within reasonable proximity to wells actually producing oil. The tract was, therefore, not entitled to a well as an exception to the spacing rules in order to prevent confiscation. Rule 37 of the Railroad Commission; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107; Nash v. Shell Petroleum Corp., Tex.Civ.App., Austin, 120 S.W.2d 522 (Writ Dis.)

The plea of estoppel is predicated upon and involves these facts:

The three tracts into which the Church property was divided were each separately leased for oil and gas development purposes to B. F. Carroll about six years after the subdivisions were made. Carroll procured permits from the Railroad Commission to drill wells on each of the tracts. No one protested the issuance of these permits. Shortly thereafter Carroll drilled a well each on the Cook and Hendricks tracts. They each produced oil for about three and one-half years and until 1941, when the wells became clogged with paraffin and the flow of oil was seriously impeded. Carroll, at such time, being indebted to the Overton Refining Company, transferred both leases (Cook and Hendricks) and wells to such company. Overton, in an effort to clear the flow lines, placed thirty-five quarts of nitro glycerin in each of these wells which when discharged caused the pipe to collapse. Attempts were made to swedge the pipe out, which failed.

On December 5, 1941, Overton filed with the Railroad Commission on its form an application denominated, "Application to Plug and Well Record," which showed that the Cook well had a total depth of 3542' and had in it 102' of 8¼" casing and 3502' of 5½" casing. In the lower left-corner of this instrument appears the handwritten notation, "Plug and Abandon— 12-18-41—20 sacks cement. Fred A. Lucksinger."

On January 9, 1942, Overton filed with the Commission a "Plugging Record" showing this well had been plugged on December 18, 1941, which bore the notation, "Pulled out 2702 ft."

Appellee Cook bought the tract on which this well was located on August 26, 1946, for which he paid $13,250. At this time

there was no outward evidence of an oil well on the property as a concrete floor had been poured over the location of the old well and was then included in a laundry building.

Before making this purchase Cook ascertained from Carroll and the Overton Refining Company that they had no claim to the old well and claimed no oil lease on the property. He also investigated the files of the Railroad Commission and learned that no protest had been filed to the issuance of drilling permits for any of the wells drilled on the Church property and that the right of the owners to produce the wells drilled under such permits had never been challenged.

Cook further testified that in his opinion the surface rights of and improvements on this tract were worth about $6,000 or $7,000 when he made his purchase, or about half the price paid; and that he bought the lot on account of its oil value.

The price of the oil in the East Texas Field was 25¢ per bbl. in 1931; $1 per bbl. in 1937; $1.35 per bbl. in 1941; $1.75 per bbl. in 1946; and $2.65 per bbl. in 1947.

On September 9, 1946, Cook filed with the Railroad Commission notice of his intention to drill on his lot. This form was regular and did not indicate the existence of the old well.

On November 21, 1946, the Commission issued notices to interested parties, including appellant, of Cook's application, which, in part, recited, "This is an application to redrill an old plugged well granted B. F. Carroll in case 24,476."

After hearing, Cook's application was granted and permit was issued on January 14, 1947. We quote from this permit:

"Now, Therefore, It Is Ordered that the application of C. C. Cook for an exception under the provisions of Rule 37 and a permit to redrill and put back on production well No. 1, C. C. Cook on Lots 6 and 7, Block 153 Kilgore Townsite, East Texas Field, Gregg County, Texas, as shown by Plat submitted, is hereby approved and applicant is granted permission to redrill and put back on production well No. 1 which is spaced as follows: * * *

"It Is Expressly Stipulated that this well will be completed with not more than three degrees off vertical, and that a directional survey of the hole be made with correction for vertical every 500 feet, and that a copy of the directional survey be filed with the Railroad Commission."

This is the permit which appellant contested and which it seeks to invalidate in this proceeding.

■ Appellant does not attack the original Carroll permit. Under the facts of this case it could not successfully do so. Midas Oil Co. v. Stanolind Oil & Gas Co., 142 Tex. 417, 179 S.W.2d 243. It contends that this permit has been exhausted, the well drilled under it abandoned, and that Cook must begin entirely anew. From this premise it reasons that no facts upon which an estoppel can be based are present since Cook has, as yet, done nothing under the permit of January 1947, which permit appellant has seasonably attacked.

■ A permit of the Railroad Commission to drill a test well for oil or gas, on its face, grants this permission and nothing more. Strictly speaking, it might be said that when the well is drilled, the office of the permit is terminated and the permit "exhausted." We know that this is not the full nature of an application to drill a well nor the extent of the rights conferred by a permit to drill. As a necessary consequence such permit carries with it the right, in the event of production, to operate the well and to produce the oil or gas under the rules and regulations of the Railroad Commission. The life of such permit and the privileges conferred by it are not limited by any law or rule of the Commission.

This record does not show that the rights and privileges granted by the original permit have been actually or factually terminated and we have found no legal basis for holding that they have expired as a matter of law.

We are very doubtful that the legal doctrine of abandonment, as applied to the Cook well, has anything to do with this case. There is no dispute between the parties as to the ownership of the Cook well or what remains of it. Nor are we dealing

with the question of forfeiture for lessee's failure to produce under an oil and gas lease. Appellant had no right to compel operation of or production from the Cook well. In fact its interests were best served by failure to operate the well.

The Cook well is on Cook's property and possession of the property has remained in the owners. The most that can be said of the well is that the owners, having damaged the well, failed to repair and operate it. This is mere nonuser which is not sufficient to constitute abandonment. Loomis v. Gulf Oil Corp., Tex.Civ.App., Eastland, 123 S.W.2d 501 (Writ Ref.), and authorities there cited; also the case cited next below.

Abandonment is principally a matter of intention which must be established by clear and satisfactory evidence. Dallas County v. Miller, 140 Tex. 242, 166 S.W.2d 922. An intention to abandon involves an intention not to return and reoccupy the property. Evans v. Evans, Tex. Civ.App., Ft. Worth, 50 S.W.2d 842 (Writ Ref.).

Measured by these standards the evidence does not conclusively show an abandonment. At most an issue of fact was raised which under the implied findings of the Commission and trial court have been resolved against appellant. These findings are supported by substantial evidence.

The Cook well produced oil for more than three years when paraffin stopped the flow of oil. In attempting to remedy this situation the well was seriously damaged. For reasons deemed adequate by the operators no effort was made to repair the well and put it back on production. It is suggested that these reasons were economic. If so, we know of no better reason which could be assigned.

The well was then plugged as required by the Commission and now, several years later, business conditions having improved, particularly the price of oil, Cook evidently believes that it will be profitable to put the well back on production. There is nothing unusual about this course of events. It is just the difference between bad business and what it thought to be good business.

It is common knowledge that in recent years many old oil wells, long since plugged and "abandoned," have, because of scientific improvements in the production of oil, been reconditioned, treated and put back into production. This illustrates the will of our people to produce and conserve as much oil as possible. The action of Cook and the Commission is in keeping with this policy.

Finally, it is argued that Cook will have to drill a new well. He is authorized only to redrill the old well and put it back on production. He testified that he intended to go back into the same casing that is in the old well and he has been prohibited by the Commission from drilling the well more than three degrees off vertical.

The Railroad Commission, an expert body, considered and determined the feasibility of redrilling this well and putting it back on production. There is no evidence in this record to show that the Commission erred in this respect.

The judgment of the trial court is affirmed.