**RAILROAD COMMISSION et al. v.**
**MARRS et al.**

No. 9241.

Court of Civil Appeals of Texas. Austin.
March 25, 1942.

Rehearing Denied May 13, 1942.

**1038**

Gerald C. Mann, Atty. Gen., and Tom D. Rowell, Jr., James D. Smullen, E. R. Simmons, Edgar W. Cale, and Henry D. Lauderdale, Asst. Attys. Gen., for appellants.

Dallas Scarborough, of Abilene, and Phillips, Trammell, Estes, Edwards & Orn, of Fort Worth, for appellees W. T. Crier and McElroy Ranch Co.

White, Taylor & Chandler, of Austin, H. L. Stone, of Pittsburgh, Pa., John E. Green, Jr., of Houston, P. O. Settle, of Fort Worth, and Black, Graves & Stayton, of Austin, for appellee, Gulf Oil Corporation.

Henry H. Brooks, of Austin, Dorsey Hardeman, of San Angelo, and Joe G. Montague, Ira Butler, James & Connor, Mark McGee, Cantey, Hanger, McMahon, McKnight & Johnson, and Gillis A. Johnson, all of Fort Worth, for appellees E. C. Marrs and Federal Royalties Co., Inc.

Robert E. Hardwicke, Jr., of Fort Worth, amicus curiae.

BLAIR, Justice.

This appeal is from the judgment of the trial court declaring invalid and permanently enjoining the Railroad Commission and the Attorney General from enforcing the Commission's proration orders allocating and apportioning the allowable production of oil from the McElroy field in Crane and Upton counties as between the producers therein for the months of March, April, May, and June, 1941, being parts of the Commission's statewide orders dated March 5, March 27, April 22, and May 26, 1941, which allocate and apportion the total allowable production for the whole state as between the various oil fields, provide for shut-down days as further limitation of production, and limiting total production to the market demand for these months; and also permanently enjoining the Commission from thereafter restricting appellees from producing, using, or marketing less than 35,000 barrels of oil daily from the portion of the McElroy field in which they were interested, instead of approximately 6,500 barrels daily as fixed by the orders complained of.

We have reached the conclusion that the judgment of the trial court must be reversed and judgment here rendered declaring the orders complained of to be valid and dissolving the injunction granted.

Before stating the issues involved for decision, a description of the McElroy field

and a history of its development will be made. The map here inserted delineates its boundaries and shows other pertinent data and facts:

Prior to the order of March 5, 1941, the field had been developed under the supervision of the Commission as three separate areas depicted on the map as (1) Church-Fields field which includes the University Block, the Texas Company strip, and the north four sections of the McElroy Ranch; (2) Gulf-McElroy field, sometimes called the "Inside McElroy", which includes all of the field lying south of said north four sections, except the McClintic field; and (3) McClintic field, being the land shown on the map in the rectangle and situated in the southern portion of the McElroy field.

Physical Characteristics of the Field.

The McElroy field as defined on the map is about 11 miles long and 2½ miles wide, contains some 16,500 acres estimated to be productive. It runs generally north-west and southeast the lighter production area being on the west side of the field and increasing as it proceeds eastward. Production is obtained from what is known as Dolomitic limestone with the underground structure dipping to the north and dipping steeply at the east edge as compared with the gradual dip to the west. The field is shown to be a common pool, closed type reservoir, with gas drive only as reservoir energy, which before any production had a pressure of 755 pounds per square inch at an elevation of 200 feet below sea level adjusted to common datum plane. Wells must be drilled approximately 3,000 feet deep to reach pay sand or structure. The greatest sand thickness of the field is under the Gulf-McElroy area, which is more porous or permeable than the other portion; the pay portion thinning out to the north and south as well as to the west and extreme east as the flanks of the field are approached. The pay thickness of the sand in the Church-Fields area is considerably thinner than the pay section in the Gulf-McElroy area; witnesses estimating the amount of oil in place originally under the Church-Fields area to be about one-half the amount of oil in place originally under the Gulf-McElroy area.

History of Production and Development.

In the Church-Fields field the first well was discovered in April, 1926; immediately thereafter some 332 wells were drilled during the remainder of 1926 and in 1927, on a spacing pattern prescribed by the Commission of approximately 1 well to 10 acres, the area being developed to 1 well to approximately 18 acres, although some portions were more densely drilled. These wells were produced at full flow until the proration statutes became effective in that field, on or about January 1, 1931, though not effective entirely in the whole field until the latter part of that year, or the first part of 1932. Of the 332 wells, 202 were drilled in the University Block and were produced at full capacity prior to proration for approximately four years. In 1926–27 there were drilled on the Texas Company strip 15 wells which were produced for the approximately four-year period at full flow or capacity. There were drilled 115 wells on the north four sections of the McElroy Ranch in 1926–27 which produced at full flow or capacity until proration became effective.

As delineated on the map, the Church-Fields field contains 6,000 acres of land,

but according to unitized productive acreage, the University Block area has 3,920 acres, the Texas Company strip about 103 acres, and the north four sections of the McElroy Ranch about 1,710 acres. To January 1, 1941, these three areas had produced 87,325,851 barrels of oil, about 57,000,000 barrels from the University Block, 10,500,000 from the Texas Company strip, and 20,000,000 barrels from the north four sections of the McElroy Ranch. Of the 67,500,000 barrels produced from the University Block and the Texas Company strip, 49,000,000 were produced before proration and some 18,500,000 since; and of the 20,000,000 barrels produced from the north four sections, 11,000,000 were produced before proration and 9,000,000 since. Calculated another way, the 3,920-acre University Block has recovered to January 1, 1941, approximately 14,540 barrels of oil per acre, and the whole Church-Fields field on a basis of 6,000 acres has recovered 14,554 barrels per acre.

All wells of the University Block and the Texas Company strip produced at full flow prior to proration. At the time proration went into effect all of the wells except two had ceased to produced through reservoir pressure and had passed into the pumping stage, having utilized and reduced the original reservoir pressure of 755 pounds to an average of about 200; the lowest pressure being about 65 pounds slightly to the east of the central portion of the University Block, where 19 leases had been densely drilled and had produced about 36,000,000 barrels of oil, creating the lowest pressure area in the field.

Oil was discovered in the Gulf-McElroy or Inside McElroy field in July, 1926, and to January 1, 1941, this field had produced 27,210,556 barrels of oil, of which 15,000,000 barrels were produced from 27 wells in operation prior to proration in that field, which began in the latter part of 1933. Since proration, the drilling of this field has proceeded on a pattern of 1 well to 17.8 acres approved by the Commission, and as of May 1, 1941, there were 146 wells, all flowing except 2 at the edge of the field. At the time of the trial and for the past several years the Gulf Oil Corporation, lessee of all of the McElroy Ranch, including the north four sections situated in the Church-Fields field, has had 6 strings of tools running, with 24 crews engaged in new drilling, spacing the wells so as to ultimately drill the 9,500 acres in this field to 1 well to 17.8 acres, in accordance with the pattern prescribed by the Commission, the Commission always permitting the drilling just as the interested parties desired. As the result of this plan of development, only a comparatively small part of the oil originally in place in this field has been recovered and the original reservoir pressure of 755 pounds still remains on an average for the field at 550 pounds.

The McClintic field was discovered in 1928 or 1929, has been densely drilled, and according to the facts found by the trial court has produced 95% of the oil originally in place thereunder. No issue as to drainage of oil to it seems to be involved, but the allowable production distributed to it by the orders complained of is attacked as being discriminatory. The trial court also found that there remain in place 80% of the oil originally under the Inside McElroy area, and 15% of the oil originally under the Church-Fields area.

The Gulf Oil Corporation is the lessee of the McElroy Ranch properties, the north four sections of which lie in the Church-Fields field, and which were developed in 1926–27 to a density of 1 well to 15 acres under the spacing pattern of 1 well to 10 acres applicable to the Church-Fields field. These wells were produced at full flow, and before proration were claimed to have protected the balance of the McElroy Ranch property to the south from drainage to the Church-Fields field to the north, and to have created an effective zone of interference between the McElroy Ranch and the areas to the north, except possibly as to 1 well on the Texas Company strip; but that with the coming of proration and the leveling out of the reservoir pressure oil began to drain to the low pressure areas to the north under the law of physics applicable to the migratory nature of oil when the reservoir energy is put into action by the drilling of wells and production of oil therefrom.

All of the above production occurred before the Commission made the proration orders here complained of. The last eight years of this production were under proration. At various times appellees complained of drainage from their properties to the north and filed several suits relating thereto, but they were never prosecuted to final judgment; and from time to time the Commission made orders adjusting the allowable production as between the three separate fields shown on the map. On March 5, 1941, the Commission declared that the three separate fields or areas delineated on the map

were in fact one common pool or reservoir; and in part that order and the subsequent three orders complained of have dealt with the field on the basis of the combined field, now known as the McElroy field. The proration formula used by the Commission is that applicable to some other fields in Texas of similar nature, which prorates the oil upon the basis of 50% per well and 50% average potential productivity as applied to unitized acreage and other factors. As a result the 6,000 unitized acres in the old Church-Fields field, consisting of the University Block, the Texas Company strip, and the north four sections of the McElroy Ranch, have received approximately 40% of the allowable for the field under the orders complained of, or about 21 barrels per well per day. The old Gulf-McElroy field or area, with 146 wells at the time of the trial drilled to a density of approximately 1 well to 37 acres on the developed unitized area of 6,080 acres of the 9,500 acres in the field, has been awarded from 50 to 53% of the allowable for the entire field, or about 67 barrels per well, the remainder being distributed to the McClintic field.

After protesting these orders, appellees, the royalty owners, the lessors, and the lessee Gulf Oil Corporation, under oil and gas leases covering the north four sections of the McElroy Ranch situated in the Church-Fields field and substantially all of the lands situated in the Gulf-McElroy or Inside McElroy field, alleged that the net effect of the orders complained of was to restrict the production from the Gulf-McElroy field or area to about 6,500 barrels of oil daily; that so restricted, appellees, being under the conservation laws not any longer able to fend for themselves by offset wells or competitive drilling and flow as formerly permitted under the rule of capture before proration, are deprived of fair opportunity to produce the recoverable oil which now underlies their lands, and can neither prevent nor substantially diminish its drainage to the pressure sink which has been created and in existence since proration to the north in the Church-Fields field or area; and that after numerous ineffectual complaints to the Commission for relief of this condition, "this suit was brought (1) as an action in the nature of a statutory appeal, invoking the special jurisdiction of the Travis County District Court; and (2) as a suit in the nature of a bill in equity addressed to the general jurisdiction of that court to protect complainants' rights under the guaranties of the State and Federal Constitutions against confiscation."

A full de novo trial based on facts adduced in the court was had. The statement of facts consists of more than 2,000 pages with several hundred pages of engineers' exhibits, graphs, maps, plats, etc.; practically all the evidence being that of expert witnesses, trained and learned in the oil production industry, and was based upon estimates and opinions, which in turn were based in most instances on factual data, or experience had in the particular field. In substance, the experts for the appellees testified to many methods of calculating drainage of oil from one area to another, and were of the opinion that from 7 to 12 million barrels of oil had drained from the Gulf-McElroy field to the area to the north, principally to the Texas Company strip and four adjacent sections to the north in the University Block. The expert witnesses also testified that the use of the gas reservoir energy or pressure to produce 6,500 barrels of oil daily from the 146 wells in the Gulf-McElroy area was an inefficient use of the gas energy, resulting in waste thereof, and that in their opinion the area could produce 35,000 barrels daily with greater efficiency and greater ultimate recovery of oil; which opinions seemed to be based upon their general views or knowledge rather than upon any actual data or experience from the field in question.

The trial court found that drainage of oil from appellees' property had been and was taking place, and that already 7 million barrels had drained to the north since proration and prior to the date of trial. The trial court also found that the 146 wells drilled on the developed 6,080 unitized acres of the 9,500 acres in the Gulf-McElroy area could produce 35,000 barrels of oil daily with greater efficiency than would a greater number of wells; and that waste was resulting by the inefficient use of gas energy by these wells under the present allowable; and that the production of 35,000 barrels daily from the Gulf-McElroy area would greatly decrease drainage, and would increase greater ultimate recovery of oil from the pool. The court further declared the orders of the Commission allowing only 6,500 barrels of oil to be produced daily to be invalid and to amount to confiscation of the property of the owners of the Gulf-McElroy area, and perpetually enjoined the Commission from entering any further orders which would re-

duce the allowable of the Gulf-McElroy area below 35,000 barrels of oil per day, except upon certain changed conditions.

It is manifest that the trial court determined the matters presented to it just as if they were submitted to it originally, without regard to any action theretofore taken by the Commission, concluding that "the existence of such drainage has been established in this case by satisfactory and convincing evidence." It permitted the introduction in evidence of a transcript of the proceedings and evidence of the hearing before the Commission on each proration order here involved, but made no use of them material to this appeal. The trial court's findings of fact and conclusions of law plainly show that it simply weighed the evidence from the viewpoint of a court or jury in its fact finding function in an ordinary civil suit without reference to the findings of the Commission, accepting or disregarding evidence as it might believe or disbelieve the testimony of the several witnesses and the respective theories they advanced, on either the issue of drainage or waste of reservoir energy in producing oil, and in this manner reached the conclusion that the evidence so accepted constituted satisfactory and convincing evidence. This sort of trial of the suit testing the validity of the proration orders is contrary to the rule announced by the Supreme Court in the cases of Railroad Commission of Texas and Trem Carr v. Shell Oil Company, Inc., et al., 161 S.W.2d 1022; and Cook Drilling Company et al. v. Gulf Oil Corporation, 161 S.W.2d 1035, decided March 11, 1942, not yet published [in State Reports], wherein the court holds that in a suit attacking the validity of any order of the Commission administering the oil conservation laws, or rules and regulations pertaining thereto, the inquiry is confined to the question of whether or not the order, rule or regulation is sustained by substantial evidence in existence at the time the order, rule or regulation was made, determinable from evidence adduced in the trial court only, the court being required to determine this question of law from a consideration of all the probative evidence adduced and not from a consideration of the evidence as determinative of an original issue of fact, independent of the Commission finding.

When the evidence adduced on the trial de novo by all parties is considered in the light of the physical facts, the history and experience of development detailed, the conservation laws, and the rules and regulations pertaining thereto, there existed at the time the orders complained of were made substantial probative evidence sustaining them.

The theory of drainage asserted is that because most of the oil under the Church-Fields area has been withdrawn and the gas energy largely exhausted, the space or void thus made is being refilled by oil and gas energy draining from the Inside McElroy area, which still has a large oil reserve and high gas pressure. Experts testified that if the theory were true, the leases farthest north in the Church-Fields area should show drainage last and a smaller amount. The contrary was shown to be true. The wells on the one-half mile strip across the field and immediately north of the Texas Company lease showed the smallest oil reserves and the lowest gas energy, the second similar strip showed larger reserves and gas energy, and the third similar strip showed still larger oil reserves and gas energy during the first three years of proration. Expert opinion was that these facts rather showed drainage from other sources, or that the larger oil reserve and gas pressure were the result of proration which caused the leveling out and uniform use of the gas energy; and that improved methods of production accounted for the recovery of more oil from the area rather than drainage of oil thereto from other leases.

The most permeable or porous portion of the McElroy field is in the Inside McElroy area. All of the area where the pressure sink exists is less permeable or porous to the extent that even where sand thickness is the same as the Inside McElroy, only about one-half as much oil is recovered; and expert opinion was that under the law of physics oil and gas energy do not drain or migrate as readily to the less permeable or porous areas as they do to the more permeable or porous areas.

With respect to the inefficient use of gas energy and the waste of it in producing only 6,500 barrels daily from the unitized 6,080 acres in the Inside McElroy area, the experts gave different views, but the sworn reports of the producers in this area to the Commission, made in the actual production of the oil, showed that for eight out of thirteen consecutive months gas-oil ratio increased with increased production and decreased with reduced production over the entire area.

We are further of the view that even if substantial drainage of oil and in-

efficient use of gas energy were taking place as claimed by appellees, they are not entitled to the relief granted by the trial court for two reasons. In the first place appellees have not developed their Inside McElroy leases, either before or after proration, in accordance with the applicable well spacing rules, although they have had at all times an equal opportunity to do so along with the lessees of the lands to the north and to which it is claimed their oil and gas energy is draining or migrating.

Appellees knew after the drilling of the second well in 1926 that the Church-Fields area and their Inside McElroy area were on the same geological structure and were a common pool. Accordingly they undertook in 1926 to develop the north four sections of their McElroy Ranch lease to a density commensurate with the leases to the north as an effective barrier to drainage when producing at full capacity or flow. Early in the development appellees devised a plan to develop their 9,500-acre Inside McElroy field, their witness testifying that the plan was to drill "one well in the center of each quarter (section) and eight wells on the sides around an octagon, and they drilled over the space 75 wells to protect the property from drainage prior to proration; and I presume that they thought the wells were doing a good job of protecting the properties." Under this plan, which the Commission approved, the area was to be drilled 1 well to 17.8 acres, and to the date of the trial the 6,080 unitized acres had been drilled to a density of 1 well to 37 acres, but some 3,500 acres of the Inside McElroy area had not been drilled at all. The witness for appellees conceded that if the Inside McElroy field had been drilled before and after proration to the density the rule prescribed and commensurate with the leases to the north, the drainage and reservoir energy differentials now complained of would not exist.

In Railroad Commission v. Gulf Production Co., Tex.Civ.App., 115 S.W.2d 505, 507, this court held that "a lessee is entitled only to an equal opportunity with the lessees of adjacent lands to recover his fair share of the oil in place beneath his tract; and when he is enabled to do so, the requirements of the law and the commission's rule to protect him against confiscation have been met."

The rule of capture of oil as once applied in this state has been greatly limited or modified by the Conservation Laws and the rules and regulations of the Commission pertaining thereto; and unless all producers of oil comply with them alike they become ineffective. A producer destroys the proration statutes and spacing rule when he refuses to drill his land to the same density with adjacent lands, and then insists that he should be given larger allowables in order to get as much oil as his neighbor who has complied with the well spacing rule. Such practice would destroy the Conservation Laws and the rule. Not having complied with the rule, he cannot claim confiscation of his property because, as was said in the case of Wood v. Gulf Oil Corporation, Tex.Civ. App., 147 S.W.2d 818, 820, "the test of this issue is whether the owner with the wells he already had [or has a right to drill] 'has been given a fair and equal opportunity with other producers on surrounding tracts within the drainage area to recover his fair share of the oil in place beneath his tract. If he has, no confiscation results.'"

It seems to be the contentions of appellees that since they have used what they believe to be diligence in development, and since the spacing of wells or drilling of additional wells is not necessary to protect their properties, and that due to a decrease in the market demand for oil, it is a useless requirement to compel them to drill more wells in order to get less oil per well. These are but attacks upon the laws and rules themselves, and having accepted and operated under them, appellees cannot attack their constitutionality without showing that some peculiar conditions, not applicable to all producers similarly situated, exist which they did not show. Brown v. Humble Oil & Ref. Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107.

It is true that "the Commission did not have authority, under the prescribed spacing pattern, to compel him [appellees here] to drill to a greater density; but they clearly had the authority to fix his allowable on the basis of a 10-acre pattern [a 17.8-acre pattern here], unless he did." F. A. Gillespie & Sons Co. v. Railroad Commission, 161 S.W.2d 159, 162, decided by this court March 4, 1942. This principle of law is entirely applicable in the instant case under the facts as herein stated.

In the second place, the trial court in perpetually enjoining the Commission from

interfering with appellees in the production of 35,000 barrels of oil daily, instead of about 6,500 as fixed by the orders involved, has evidently misconstrued the provisions of the Conservation Laws, particularly the proration statutes and statutes and rules for the prevention of waste. Those immediately involved are as follows:

"Art. 6014. 'Waste'

"The production, storage or transportation of crude petroleum oil or of natural gas in such manner, in such amount, or under such conditions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among other things shall specifically include:

\*    \*    \*    \*    \*    \*

"(h) Surface waste or surface loss, including the storage either permanent or temporary of crude petroleum oil, or the placing any product thereof, in open pits or earthen storage, and all other forms of surface waste or surface loss, including unnecessary or excessive surface losses, or destruction without beneficial use, either of crude petroleum oil or of natural gas.

\*    \*    \*    \*    \*    \*

"(j) The production of crude petroleum oil in excess of transportation or market facilities or reasonable market demand. The Commission may determine when such excess production exists or is imminent and ascertain the reasonable market demand." Vernon's Ann.Civ.St. art. 6014.

"Allocation among pools to prevent discrimination.

"Sec. 6. In order to prevent unreasonable discrimination in favor of one pool as against another, and upon written complaint and proof of such discrimination, the Commission is authorized to allocate or apportion the allowable production of crude petroleum oil upon a fair and reasonable basis among the various pools in the State; provided, however, that in allocating or ascertaining the reasonable market demand for the whole State the reasonable market demand of one pool shall not be discriminated against in favor of any other pool; and provided further, that the Commission shall ascertain the reasonable market demand of each such respective pool as the basis for determining the allotments to be assigned each such respective pool, to the end that such discrimination may be prevented." Vernon's Ann.Civ.St. art. 6049d.

Apparently the trial court construed these statutes as requiring the Commission to first ascertain the market demand for oil in a particular field, and to then distribute the allowable production in the field accordingly as between the producers in the field. This construction is manifest from the fact that the 35,000 barrels daily allowable is nearly three times as much oil as the proration orders complained of allocated to the entire McElroy field, and more than five times as much oil as was distributed by said orders to the Inside McElroy area as between the producers in the entire McElroy field. This construction is further manifest from the fact that appellees do not attack the findings of the Commission as to the amount of market demand for the whole state; nor do they claim that the Commission did not fairly allocate to the McElroy field its fair portion of the entire amount of the statewide market demand. This construction is further evidenced by the fact that appellees alleged, offered proof tending to show, and the trial court found that they had their own refineries, their own pipe lines to them, their own steel storage facilities, and private contracts for the sale of all the oil and products of the 35,000 barrels allowed to them daily. And it was further shown that unless appellees were allowed 35,000 barrels daily they would be compelled to purchase oil from other producers in other fields, or from foreign markets, to operate their refineries. Upon these facts and the further findings that drainage of oil and inefficient use of gas energy would occur unless 35,000 barrels of oil were produced daily from the 146 wells on the Inside McElroy area, the court held that any order restricting the production to less than 35,000 barrels daily would constitute confiscation of appellees' properties.

We construe these statutes relating to proration and waste of oil as requiring the Commission to first ascertain the market demand for the whole state and to then allocate or distribute the total production without discrimination as between the various fields in the state, and to then distribute the amount allocated to each field without discrimination as between the producers in the field. Such construction was given to them in the case of Railroad Commission v. Continental Oil Company, 157 S.W.2d 695, 699, by the Beaumont Court of Civil Appeals, and wherein the court say: "But it is equally clear that

proration cannot be made upon the market demand of each pool, as a separate producing unit, for the market demand of some one pool might consume all of the state allowable; so, proration must be based on the market demand of each pool as its market demand enters into and in the judgment of the Commission constitutes a fair proration as it relates to the market demand of the entire state—* * *. Bay Petroleum Corp. v. Corporation Commission, D.C., 36 F.Supp. 66."

This Continental case fully discusses what we regard as the proper interpretation of the proration statutes, which is the interpretation that the Commission has continuously placed upon them. It may be also observed that the states of Kansas, Louisiana, New Mexico, and Oklahoma each have proration statutes which require "allocation among pools to prevent discrimination". This language is identical with our statutes, and in so far as we have been able to ascertain each of these states has construed its proration statutes in like manner as we have here construed our statutes. Julian Oil & Royalties Co. v. Capshaw, 145 Okl. 237, 292 P. 841; Danciger Oil & Ref. Co. v. Smith, D.C., 4 F. Supp. 236.

Our Conservation Laws subject the oil industry to extensive regulation—regulation so extensive in fact that it reaches production, sale, manufacture, storage, refining, distribution, transportation, and proration of production within market demand, their purpose being the conservation of this natural resource and to prevent the physical waste of it however caused from the time production begins until utilization. Such laws simply provide a state regulated cooperative plan whereby the legislature has committed to the Commission the duty of conserving oil in order that the greatest ultimate recovery of it may be had economically and with the least possible physical waste; and to be effective each producer must reasonably comply with them and the pertinent rules and regulations of the Commission at all times. If appellees had drilled their lands in accordance with the applicable spacing rule at the time the adjoining owners so drilled their lands, the drainage and inefficient use of gas energy complained of would not now exist; and having failed to do so we know of no rule of law or equity which would permit them to now produce more than five times as much oil as the proration orders prescribe and the present market for oil demands.

Stated another way, appellees cannot voluntarily fail or refuse to drill their lands in accordance with the applicable spacing rule at the time the adjoining owners so drilled their lands, and then years later demand and claim a greater portion of the allowable production because they had theretofore failed or refused to properly develop their lands so as to prevent the drainage and inefficient use of gas energy complained of. Such in effect is the basis of appellees' complaint, although they seek to modify it by the contentions that they have used reasonable diligence to develop in accordance with the rule, in which the Commission has agreed or acquiesced, and that due to a decrease in market demand for oil, it is a useless requirement to compel them to drill more wells in order to get no larger or even a still lower allowable. The evidence does not sustain any such agreement with the Commission, and this court has often held that neither the Commission nor the producer can agree to violate the spacing rule. And while the Commission cannot compel one to drill his land to the density prescribed by the rule, it has the authority to fix his allowable on the basis of the rule, unless he does so.

The judgment of the trial court is reversed and judgment is here rendered declaring the proration orders involved to be valid, and dissolving the injunction granted by the trial court.

Reversed and rendered.