**STATE of Texas, Appellants,**

v.

**ASSOCIATED METALS & MINERALS CORPORATION, dba Gulf Chemical and Metallurgical Company, Appellee.**

**No. A2408.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

April 1, 1981.

Rehearing Denied May 6, 1981.

Mark White, Atty. Gen., John W. Fainter, Jr., First Asst. Atty. Gen., Ted L. Hartley, Executive Asst. Atty. Gen., Douglas G. Caroom, Jim Mathews, Asst. Attys. Gen., Austin, James R. Ansell, Asst. County Atty., Galveston, for appellants.

F. Walter Conrad, Jr., Robert E. Morse, III of Baker & Botts, Houston, McLeod, Alexander, Powel & Apffel, Galveston, for appellee.

Before J. CURTISS BROWN, C. J., and PAUL PRESSLER and JUNELL, JJ.

J. CURTISS BROWN, Chief Justice.

This is an appeal by the State of Texas from the modification of an agreed judgment between the State and Gulf Chemical and Metallurgical Company pursuant to a suit *brought by the Texas Air Control Board through the State* for violations of the Texas Clean Air Act.

The State and Galveston County prosecuted an enforcement action against Associated Metals and Minerals, Inc., doing business as Gulf Chemical and Metallurgical Company (Gulf Chemical or Gulf), in August of 1975, alleging violations of the Texas Clean Air Act (the TCAA or the Act) at Gulf Chemical's Texas City tin smelting plant. At that time, the Texas City facility was equipped only with reverberatory furnaces, which were considered economically and environmentally obsolete.

Gulf applied to the Texas Air Control Board (the TACB or the Board) for a permit to build new smelting facilities at the Texas City plant, including a "Kaldo" furnace, designed to replace the out-dated reverberatory furnaces. The permit application specified that the Kaldo would be operated using the "oxide method" of volatilization and all data submitted were based on employing that method. Permit C–5094 was granted on February 28, 1977, enumerating the following requirements, among others: (1) Construction of the facilities had to be commenced within one year of the date of issuance or the permit would become invalid; (2) sampling, monitoring and testing of the emissions from the Kaldo and the facility were required; (3) both the Kaldo and the reverberatory furnaces had to be funnelled up the plant's 250-foot smokestack; (4) maximum opacity of the emissions from the 250-foot stack was limited to 20%; (5) the maximum sulfur dioxide emission rate from the Kaldo furnace was limited to 102 pounds per hour (lbs./hr.), and 175 parts per million (ppm) during any six-hour period or 300 lbs./hr. and 500 ppm during any two-hour period; (6) the maximum sulfur dioxide emission rate from the 250-foot stack was limited to 500 ppm during any six-hour period and 700 ppm during any two-hour period; (7) simultaneous operation of the Kaldo and the reverberatory furnaces was forbidden; and (8) operation of the reverberatory furnaces was forbidden except in the event the Kaldo became inoperable for a period of more than 24 hours.

On March 17, 1978, an agreed judgment was entered in the State's TCAA enforcement action. The judgment required Gulf to pay penalties of $62,500.00 to the State and $31,250.00 to Galveston County for vio-

lations of the Act. The judgment permanently enjoined Gulf Chemical from violating specific TACB rules and regulations limiting emissions rates. By injunction, it required Gulf to (1) construct and complete the Kaldo by March 1, 1979 within the specifications and limitations of Permit C–5094, (2) commence operation of the furnace within 90 days of completion, and (3) file an application for an operating permit within 60 days of the date that the Kaldo was first put into operation. The TACB was enjoined to consider the permit application and grant it within a reasonable time, if the furnace complied with Permit C–5094. The judgment further enjoined Gulf from violating other emissions limitations found in the TACB rules and regulations after the issuance of an operating permit.

Gulf Chemical completed the Kaldo furnace and, in October of 1978, commenced operations. During the first half of 1979, it became evident that the Kaldo would not function as expected. The furnace did not emit pollutants in excess of the TACB ceilings established by the rules and regulations and by the permit. However, it did not produce tin at the projected rates. Gulf calculated that, by using the oxide process (which was the basis of the permit application), the facility operated at a loss of $20,000.00 per day. The loses caused employee layoffs and threatened to force more layoffs and a shutdown of the entire plant. Gulf determined that the problem could be resolved by switching over to the "sulfide process," which required that pyrite, a sulfur compound, be injected into the Kaldo in the final stages of the smelting process.

Gulf expected to triple or quadruple its production rate with the new process. The process change did not require the addition of any equipment to the furnace; all necessary equipment was already in place. The oxide process required, "roasting" the pyrite out of the raw materials before smelting, causing sulfur dioxide emissions. The sulfide process did not require roasting. The emissions of both the roasting process and the Kaldo operation were routed up the same 250-foot stack. The sulfide process produced short-term peak emissions in ex-

cess of the special provisions of Permit C–5094. The evidence supports the conclusion that during any 24-hour period, total emissions would be substantially the same regardless of the process employed. The construction permit allowed 11,300 lbs./hr. of the sulfur dioxide per day. The sulfide process emissions rate was estimated to be 1,956 ppm during any two-hour period. The new particulate emissions were expected. There was evidence that the effect on the ambient air quality of Texas City would be, in a worst case scenario, to raise the sulfur dioxide levels from one-fifth to one-fourth of the State and Federal standards.

Gulf, therefore, had a series of meetings with the staff of both the TACB and the office of the Attorney General during the period beginning in December of 1979 and ending in early February of 1980 to discuss the proposed process change. Gulf was notified that the State would not agree to a modification of the original agreed judgment. On the same day, Gulf filed a motion to modify the court judgment. On February 29, 1980, the court entered a modified judgment.

The modified judgment allowed Gulf to begin using the sulfide process immediately. It required Gulf to commence construction of a "sulfur scrubber/recovery unit," which would significantly reduce sulfur dioxide emissions. The judgment (1) allowed Gulf to emit sulfur dioxide from its 250-foot stack at a rate of 3500 ppm during any two-hour period (the statewide standard established by the TACB rules and regulations), (2) prohibited Gulf from simultaneously operating the Kaldo and performing roasting operations, (3) required Gulf to apply to the TACB for a modified construction permit within two weeks of the date of judgment and (4) temporarily stayed special provisions 2, 13, 14 and 17 of Permit C–5094, containing the maximum sulfur dioxide emission rate limitations and monitoring and sampling requirements. The judgment was, by its own terms, to operate only until December 1, 1980. The judgment provided for an extension in the event that the TACB failed to act on the application for a modified permit by December 1, 1980.

The State appealed and filed notice of supersedeas. This court granted Gulf's motion for a temporary stay of the supersedeas *to protect our jurisdiction.* 595 S.W.2d 924. The State then applied to the Supreme Court for a writ of mandamus to set aside the stay, which was denied. So far as the record shows, the TACB has not acted on Gulf's application for a modified permit and Gulf has not installed the sulfur scrubber/recovery unit.

The State appeals from the modified judgment on the grounds that (1) the trial court had no jurisdiction to modify because exclusive jurisdiction to modify lay with the TACB, (2) the trial court erred in modifying the judgment because it balanced the equities of the case, contrary to case law and the provisions of the statute, (3) by allowing the use of the sulfide process, the court suspended a law of the state, thereby violating Article 1, § 28 of the state constitution and (4) by declaring unenforceable Special Provisions, 2, 13, 14, and 17 of Permit C–5094, the court usurped the legislative function, thereby violating Article II, § 1 of the state constitution.

The TCAA establishes the Board as the authority for protecting air quality by establishing pollution standards and emission limitations. Tex.Rev.Civ.Stat.Ann., art. 4477–5, § 1.05 (Vernon 1976). The Board acts as an agency of the State. Tex.Rev.Civ.Stat.Ann., art. 4477–5, § 2.01 (Vernon 1976). The TACB is directed to establish air quality standards and to control air quality "by all practical and economically feasible methods consistent with ... [its] powers and duties...." Tex.Rev.Civ.Stat. Ann., art. 4477–5, § 3.01 (Vernon 1976). To accomplish its objective, the Board is empowered to develop a comprehensive air quality control plan, inventory emissions, research, enter property, monitor emissions, make rules and regulations, enter orders, declare emergency conditions, conduct hearings, make fact-findings, conduct investigations, grant permits and variances, and, above all, enforce the Act and the Board's rules and regulations. Tex.Rev.Civ.Stat. Ann., art. 4477–5, §§ 3.02–3.29 (Vernon 1976 and Vernon Supp. 1980–81).

The enforcement provisions authorize the Board, through the State, to cause the institution of a civil suit to compel compliance with the Act either by seeking injunctions to halt past, present or threatened violations of the Act or by seeking civil penalties for such violations, or both. Tex.Rev.Civ. Stat.Ann., art. 4477–5, §§ 3.07, 3.27(f), 3.28(f), 4.02 (Vernon 1976). When a suit for injunction is brought, the Act directs *the court* to enter prohibitory or mandatory injunctive relief as "the facts may warrant." Tex.Rev.Civ.Stat.Ann., art. 4477–5 § 4.02(a) (Vernon 1976). It also provides for appeal from TACB rulings and orders by any person affected. On appeal, the issue is whether the Board's action was invalid, arbitrary, or unreasonable. Tex. Rev.Civ.Stat.Ann., art. 4477–5, § 6.01 (Vernon 1976).

Here, the TACB, through the State, brought this suit to enforce the Act. Thus, the Board and County invoked the jurisdiction of the court. Before the determination of the suit, the Board granted a construction permit allowing Gulf to build the Kaldo furnace and to operate it pending review of an application for an operating permit. After the construction permit was granted, the agreed judgment was entered requiring Gulf to construct the Kaldo as directed in the permit, to operate the furnace and to apply for an operating permit. Clearly, the combined effect of the permit provisions and the injunction was to require Gulf to operate the Kaldo even though such operation caused employee layoffs and substantial daily operating losses, and threatened to close the plant.

The State argues that the court had no jurisdiction to enter the modified judgment because exclusive jurisdiction to determine "changed conditions" is vested in the Board and the courts, therefore, have no authority to intervene before the agency has had an opportunity to rule on the question. The State cites three cases which addressed the question of exclusive jurisdiction to determine changed conditions: *Magnolia Petroleum Co. v. New Process Production Co.,*

129 Tex. 617, 104 S.W.2d 1106 (1937); *Railroad Commission v. Wencker*, 140 Tex. 527, 168 S.W.2d 625 (1943); and *Box v. Newsom*, 43 S.W.2d 981 (Tex.Civ.App.—Waco 1931, no writ). The language of the opinions, when removed from the context of the case, indicates that any time "changed conditions" becomes an issue, the agency has exclusive jurisdiction over the question. However, *Magnolia Petroleum* dealt with the power of the Railroad Commission to review a judicial denial of a permit. *Wencker* was concerned with the power of the Railroad Commission to grant a permit based on changed conditions when such permit had previously been denied in an appeal to the court. *Box v. Newsom* reviewed the power of the court to rule on a permit application before the Railroad Commission had had an opportunity to do so. The cases are not controlling. Whether the court could rule on an application before the Board had considered it, and whether the Board could grant a permit based on changed conditions in the face of a prior judgment denying the permit, are not at issue. The question here is whether the trial court, its jurisdiction being invoked by the Board, through the State, after entering an injunction forcing operation under the terms of the judgment, could subsequently modify its own permanent injunction to provide relief from the unexpected and irreparable injury resulting from compliance with the court order.

■ The State ignores the inherent power of the court to vacate or modify injunctive decrees, which exists even absent statutory authorization or express retention of such power in the decree. *Carleton v. Dierks*, 203 S.W.2d 552 (Tex.Civ.App.—Austin 1947, writ ref'd n.r.e.). Courts undoubtedly have jurisdiction to modify their own injunctions based on changed conditions. *City of Tyler v. St. Louis Southwestern Ry. Co. of Texas*, 405 S.W.2d 330 (Tex.1966). The court's equitable power is flexible and adaptable to the particular exigencies of the case. *Warren v. Osborne*, 154 S.W.2d 944 (Tex.Civ.App.—Texarkana 1949, writ ref'd w.o.m.). The statute itself orders the court to grant injunctive relief "as the facts

may warrant." Tex.Rev.Civ.Stat.Ann., art. 4477–5, § 4.02 (Vernon 1976).

■ The issue of exclusive jurisdiction is not, of itself, determinative of the problem at hand. Generally, the doctrine of primary jurisdiction requires the courts to allow the administrative agency to make the initial determination of the controversy when the question demands the expertise of the administrative agency and uniformity of result. *Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W.2d 753 (Tex.Civ.App. 1950, writ ref'd). The doctrine is derived from a consideration of the nature of the question and the inquiry and of the action required for its solution. Exceptions to the general rule exist when (1) the question is inherently judicial in nature, *Gregg v. Delhi-Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411 (1961), or (2) the administrative agency is powerless to grant the relief sought and has no authority to make findings essential to granting the relief sought, *Foree v. Crown Central Petroleum Corp.*, 431 S.W.2d 312 (Tex.1968).

■ The nature of an injunction is such that the question of changed conditions is inherently judicial in nature. However, in TCAA cases, the exception has been limited to situations where the question does not involve an intricate and technical matter and the determinative facts are undisputed. *Houston Compressed Steel Corp. v. State*, 456 S.W.2d 768 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ). Here, there is no dispute as to the determinative facts. The use of the oxide process caused significant operating losses and employee layoffs. The continued operation of the entire plant was threatened. The sulfide process would substantially increase production. The process would increase short-term emissions but not long-term average emissions. Although the problem at hand seemingly involves questions of allowable emissions rates, proper maintenance of air quality, best available technologies and economic reasonableness, the court has been empowered to issue injunctions "as the facts may warrant." Tex. Rev.Civ.Stat.Ann., art. 4477–5, § 4.02 (Ver-

non 1976). Moreover, the court did not attempt to determine technical points. It expressly limited the duration of the modified judgment, required Gulf to submit permit applications, ordered installation of a sulfur scrubber recovery unit with no protection for Gulf in the event that the Board later rejected the use of such a device, and found that immediate action was needed to prevent irreparable harm from occurring. The court, by the terms of its ruling, reserved intricate technical matters for presentation to the Board and reduced the questions addressed to those of changed conditions and prevention of irreparable harm. The question presented at the modification hearing met the test of *Houston Compressed Steel.* Therefore, the doctrine of primary jurisdiction did not obligate the court to abstain from deciding the issue pending appeal from a Board order.

■ The State contends that, if the court had jurisdiction, it erred by balancing the equities in reaching its decision to modify the judgment. The State argues that where a statute specifically provides for injunctive relief to enforce its provisions, the courts only have discretion to grant or deny injunctive relief based on whether a violation has occurred, is occurring, or is threatened, citing *State of Texas v. Texas Pet Foods,* 591 S.W.2d 800 (Tex.1980). The legal proposition is sound, but has no bearing on this case. The past violations were already enjoined. There were no violations occurring at the time of judgment. There was no evidence that future violations were threatened. The court was not ruling on a plea for injunctive relief against a statutory violator. The court was, instead, considering the present, unanticipated effect of a *past judgment* imposing injunctive restraints on Gulf. When the issue is whether changed circumstances warrant a modification of prior injunctive orders, a balancing of equities is not only appropriate but is also required. In § 4.02, the Act itself reflects the need for flexibility when it commands the court to grant the injunctive relief warranted by the facts of the case. Therefore, the court properly balanced the equities in deciding the case.

The State also presents two constitutional challenges to the modified judgment. The first is that, by allowing Gulf Chemical to use the sulfide process, the court either judicially granted a permit or judicially suspended the requirement that Gulf obtain a permit, in violation of Article I, § 28 of the state constitution. Article I, § 28 provides that no power of suspending the laws of the state may be exercised except by the state legislature. The State cites cases which hold (1) the courts may not suspend a statute or supervise and direct the manner and method of enforcement of a statute, *State v. Ferguson,* 133 Tex. 60, 125 S.W.2d 272 (1939), (2) the courts may not temporarily restrain a state enforcement agency from enforcing a law, *State v. Kirby,* 133 Tex. 60, 125 S.W.2d 272 (1939), and (3) the courts cannot judicially authorize doing business without a permit required by statute. *All American Bus Line v. Hawkins,* 188 S.W.2d 992 (Tex.Civ.App.—Eastland 1945, writ ref'd w.o.m.). Here, unlike the cited cases, the trial court was considering the propriety of *continuing permanent injunctions* against a company's actions in a situation where (1) the agency had ruled on the permit application, and (2) the agency, through the State, invoked the court's jurisdiction to grant the injunctions. The point is that the agency had the opportunity to rule, invoked the jurisdiction of the court in order to ensure compliance, and incorporated the permit restrictions into the judgment. The issue in court is to determine the injunctive relief warranted by the facts. When the facts indicate that changed circumstances warrant a modification, the court may enter such modification.

■ Furthermore, no permit application is required unless construction of a new facility or modification of an old facility is planned. Tex.Rev.Civ.Stat.Ann., art. 4477–5, § 3.27(a) (Vernon 1976). A physical change in a stationary source or a change in the method of operation of such a source does not constitute a modification if it results in insignificant increases in the amount of any air pollutant emitted. Tex.

**312**

Rev.Civ.Stat.Ann., art. 4477–5, § 1.03(9) (Vernon 1976). There was evidence that during any 24-hour period there would be no significant change in sulfur dioxide emissions and that the effect on the ambient sulfur dioxide levels would be negligible. The State did not claim that other pollutant emissions would increase. When measured in terms of long-term impact and ambient pollution levels, there was sufficient evidence to support an implied finding by the trial court that no modification occurred. Tex.R.Civ.P. 299. Therefore, no permit was required and the modified judgment could not constitute a judicial usurpation of administrative authority.

In its second constitutional challenge the State contends that the temporary injunction staying the enforcement of special permit provisions 2, 13, 14 and 17 amounts to judicial legislation, violating the separation of powers principle embodied in Article II, § 1 of the state constitution. The State argues that the court, in effect, undertook to write an administrative order for the TACB, a practice declared unconstitutional in *Marrs v. Railroad Commission*, 142 Tex. 293, 177 S.W.2d 941 (1944), and *Fire Department of City of Fort Worth v. City of Fort Worth*, 147 Tex. 505, 217 S.W.2d 664 (1949). Here, however, the court specifically refrained from entering an order for the agency. The modified judgment ordered Gulf Chemical to submit a permit application to the Board within two weeks of the date of rendition. The injunction staying the enforcement of the permit provisions was, by its terms, effective only until December 1, 1980, to be extended only in the event the permit application had not been ruled on by that time. Also, the court dealt with a situation where it had to consider the ongoing effect of enjoining Gulf to operate under the terms of the permit. *Marrs* and *City of Fort Worth Fire Department* are not dispositive. The court clearly reserved the legislative function for the administrative agency while shaping the relief given the State to protect the interests of all persons affected by the judgment. This point is also overruled.

Judgment affirmed.