STATE of Texas, Petitioner,

v.

ASSOCIATED METALS & MINERALS CORPORATION d/b/a Gulf Chemical and Metallurgical Company, Respondent.

No. C–458.

Supreme Court of Texas.

May 19, 1982.

Rehearing Denied July 21, 1982.

Mark White, Atty. Gen., Jim Mathews, Asst. Atty. Gen., Austin, for petitioner.

Baker & Botts, F. Walter Conrad, Jr., and Robert E. Morse, III, Houston, for respondent.

RAY, Justice.

This is an appeal from an enforcement action brought by the State of Texas and Galveston County, pursuant to sections 4.02 and 4.03 of the Texas Clean Air Act,[1] against Associated Metals and Minerals Corporation, doing business as Gulf Chemical and Metallurgical Company (Gulf Chemical or Gulf), to enjoin alleged violations of the Clean Air Act. The question before us is whether the trial court had jurisdiction to render a modified judgment in which it temporarily suspended parts of a Texas Air Control Board (TACB) construction permit

1. Tex.Rev.Civ.Stat.Ann. art. 4477–5 (Vernon's 1976).

and specified maximum emission rates to be followed by Gulf Chemical during the period of suspension. The court of civil appeals affirmed the judgment of the trial court. 616 S.W.2d 305. We reverse the judgment of the court of civil appeals and partially vacate the judgment of the trial court.

Gulf Chemical operates a tin smelting plant in Texas City in Galveston County. In August of 1975, the State of Texas and Galveston County brought an enforcement action against Gulf, alleging that the operation of Gulf's tin smelting plant violated the Clean Air Act. At the time the suit was instituted, Gulf's plant was equipped only with reverberatory furnaces, which are considered economically and environmentally obsolete.

On February 28, 1977, Gulf applied to the TACB for a permit to build new smelting facilities at the Texas City site. Gulf's proposal included the construction of a "Kaldo" furnace, which is of more recent design than reverberatory furnaces. There are two methods by which tin can be smelted in a Kaldo furnace, the oxide method and the sulfide method. Gulf's application specified that the Kaldo furnace would be operated using the oxide method and all data submitted to the board were based on employing that method. There was no mention of the sulfide process.

On February 28, 1978, the Board granted construction permit C–5094, allowing Gulf to build its Kaldo furnace. The construction permit was to govern not only the construction of the facility, but also the first several months of its operation, until the Board could act on Gulf's application for an operating permit. Permit C–5094 provided, among other things, that the maximum emission rate of sulfur dioxide from the Kaldo furnace was not to exceed 102 pounds per hour and a concentration of 175 parts per million (ppm) during any six-hour time period or 300 pounds per hour and a concentration of 500 ppm during any two-hour time period. The maximum emission rate of sulfur dioxide from the entire facility was not to exceed a concentration of 500 ppm during any six-hour time period or a concentration of 700 ppm during any two-hour time period. The permit also provided that Gulf must continuously monitor and record the concentration of sulfur dioxide in certain parts of the plant.

On March 17, 1978, the trial court rendered an agreed judgment, under which Gulf paid the State and Galveston County each $31,250 in civil penalties for past violations of the Clean Air Act. The judgment enjoined Gulf from further violating the Clean Air Act and certain rules and regulations of the TACB. The judgment also required Gulf to undertake and complete construction of the facility as specified in permit C–5094 on or before March 1, 1979. Gulf was to begin operation of the Kaldo furnace within ninety days of the completion of construction and, within sixty days of that startup, submit to the Texas Air Control Board its application for an operating permit.

Gulf completed construction of the Kaldo furnace and, in October of 1978, began operations using the oxide process. It soon became apparent that, while the Kaldo furnace conformed to the emission ceilings set forth in the permit, it produced far less tin than expected. Gulf was incurring operating losses of about $20,000 per day. These losses necessitated employee layoffs and threatened to force more layoffs and even a shutdown of the entire plant. Gulf determined that it could avert a shutdown by switching from the oxide process to the sulfide process, which, according to its calculations, would triple or quadruple tin production. The sulfide process entails injecting pyrite, a sulfur compound, into the Kaldo during the final stages of the smelting process. This results in short-term emissions of sulfur dioxide in excess of the ceilings set forth in permit C–5094.

During late 1979 and early 1980, Gulf met several times with staff of both the TACB and the attorney general's office to discuss the proposed process change. When discussions broke off in February of 1980, the state indicated that it would not consent to a modification of the March 17, 1978 agreed judgment. Gulf then filed with the trial

court a Motion to Modify Judgment, in which it asserted that the construction of a sulfur scrubber unit was necessary for it to meet both the emission limits in permit C–5094 and the increased tin production necessary to keep the plant in operation. Gulf further claimed that a scrubber unit could not be completed and made operational before October of 1980 and that to avoid employee layoffs and a plant shutdown, it needed to operate at higher sulfur dioxide emission levels until that time.

On February 29, 1980, after a six day hearing, the trial court entered its First Modified Judgment, in which it suspended until December 1, 1980 those provisions of permit C–5094 which limited the amount of sulfur dioxide Gulf could emit from its tin plant. The court also suspended the requirement that Gulf continuously monitor and record the concentration of sulfur dioxide in certain areas of the plant. The judgment allowed Gulf immediately to commence operations using the sulfide process and to emit sulfur dioxide "in amounts up to that authorized by Texas Air Control Board Rule 131.04.01.016(a)(5)." TACB Rule 131.04.01.016(a)(5) allows the emission of sulfur dioxide up to an average two-hour concentration of 3500 ppm; this is exactly five times the allowable short-term emission rate for the entire plant provided in permit C–5094. The judgment also authorized Gulf to construct a sulfur scrubber unit. Gulf was required to apply to the TACB for a modification of permit C–5094, "which application the Texas Air Control Board shall process and decide upon with all due expediency."

 The State contends that the TACB has exclusive original jurisdiction to issue permits for the construction or operation of facilities that may emit air contaminants. The State further contends that the trial court, when it rendered its modified judgment allowing Gulf to emit greater amounts of sulfur dioxide, effectively issued a temporary operating permit, thereby usurping the TACB's jurisdiction. We agree.

Section 1.05 of the Clean Air Act provides:

The Texas Air Control Board is the state air pollution control agency. The Board is the *principal* authority in the state on matters relating to the quality of the air resources in the state and for setting standards, criteria, levels and emission limits for air content and pollution control. (Emphasis added).

Gulf contends that the State's argument is defeated by the statute's designation of the TACB as the "principal", rather than the exclusive, authority in matters of air quality. We disagree. Two of the primary advantages to be derived from the creation of an administrative agency are (1) consistency and uniformity in the administration of policy and (2) the utilization of agency expertise to resolve complex problems. *See:* Mezines, Stein and Gruff, 5 ADMINISTRATIVE LAW § 47.02 (1981). We would defeat these policies if we were to sanction the action of the trial court in entering its modified judgment. We conclude, therefore, that the Legislature, when it enacted this provision, did not intend to authorize the courts to set emission limits and authorize the construction of air pollution devices, as the trial court in this case did.

Section 3.01 of the Clean Air Act provides:

The Board shall *administer* the provisions of this Act and *shall establish* the level of quality to be maintained in, and *shall control* the quality of, the air resources in this state as provided in this Act. *The board shall seek* the accomplishment of the purposes of this Act through the control of air contaminants by all practical and economically feasible methods consistent with the powers and duties of the board. *The board has the powers and duties* specifically prescribed in this Act and all other powers necessary or convenient to carry out its responsibilities. (Emphasis added).

Section 3.27, which deals with construction permits, provides:

(a) Any person who plans to construct any new facility or to engage in the *modification* of any existing facility which

may emit air contaminants into the air of this State shall apply for and obtain a construction permit *from the board* before any actual work is begun on the facility. *The Board may exempt* certain facilities or types of facilities from the requirements of Section 3.27 and Section 3.28 if it is found upon investigation that such facilities or types of facilities will not make a significant contribution of air contaminants to the atmosphere. (Emphasis added).

\* \* \* \* \* \*

(c) If ... *the board finds* the proposed facility will utilize at least the best available control technology, with consideration given to the technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from the facility and no indication that the emissions from the proposed facility will contravene the intent of the Texas Clean Air Act, including protection of the health and physical property of the people, *the board shall grant* within a reasonable time a permit to construct or modify the facility. *If the board finds* that the emissions from the proposed facility will contravene these standards or will contravene the intent of the Texas Clean Air Act, *it shall not grant* the permit and shall set out in a report to the applicant its specific objections to the submitted plans of the proposed facility. (Emphasis added).

From these provisions and from a reading of the Act as a whole, we conclude that the Legislature intended for the TACB to have the sole authority to grant or deny construction permits and to set emissions ceilings. Accordingly, we hold that the trial court was without authority to set emission limits and authorize the construction of a sulfur scrubber unit.

As section 3.27(a) indicates, a construction permit is required whenever anyone proposes to construct a new facility or *modify* an existing facility. Gulf argues that it *did not* have to apply for a permit because the proposed switch to the sulfide process was neither the construction of a new facili-

ty nor the modification of an existing facility. Section 1.03(9) defines "modification" as:

... any physical change in, *or change in the method of operation of*, a stationary source which increases the amount of any air pollutant emitted by such source into the atmosphere or which results in the emission of any air pollutant not previously emitted. *Insignificant increases in the amount of any air pollutant emitted are not intended to be included....* (Emphasis added).

Gulf's switch to the sulfide process was a change in the method of operating the Kaldo furnace and, therefore, constituted a modification for which a permit was required. Gulf argues that a new permit was not required because the change in processes fell within the exception for insignificant increases. In support of its contention, Gulf points to evidence that the sulfide process would increase short-term emissions of sulfur dioxide, but not long-term emissions.

■ We disagree with Gulf's argument that it was not required to apply to the TACB for a permit. When section 1.03(9) is read in conjunction with another similar provision of the Clean Air Act, the last sentence of section 3.27(a), it becomes apparent that the Legislature intended for the TACB, and not the courts, to determine whether a given change will result in a significant or insignificant increase. Section 3.27(a) provides: "*the Board may exempt* certain facilities or types of facilities from the requirements of section 3.27 and section 3.28 *if it is found upon investigation* that such facilities or types of facilities will not make a significant contribution of air contaminants to the atmosphere." (Emphasis added).

■ Gulf also contends that the "due course of law" provisions of Tex.Const. art. I, sections 13 and 19 authorized it to bypass the TACB and go straight to the trial court in seeking increased emission limits. Gulf argues that it was faced with immediate and irreparable harm and that action by the TACB would have been too slow, primarily

because of the requirement in section 3.17 of the Clean Air Act that public notice be given at least twenty days prior to the date of the hearing. In effect, Gulf is saying that the TACB could not have provided an effective remedy and that it had a due process right to seek out a court which could provide an effective remedy.

We hold that, under the facts of this case, Gulf cannot complain that TACB procedure constituted a denial of due process. Gulf conducted more than two months of negotiations with the State, yet never filed an application with the TACB for a modification of the original construction permit. Gulf properly should have applied to the TACB for a new permit or for a modification of the original permit. If the TACB had granted the permit, Gulf then could have sought a modification of the Galveston County district court's original judgment. If, on the other hand, the TACB had refused the application, Gulf would then have been required to appeal the decision to the Travis County district court, as provided in section 6.01 of the Clean Air Act.

Because of our holdings, we need not consider the State's other points.

The judgment of the court of civil appeals is reversed and judgment is here rendered vacating the amendments to the trial court's original judgment as contained in the modified judgment dated February 29, 1980.

GREENHILL, C. J., notes his dissent.